# WALLBERG et al. v. UTAH PUBLIC WELFARE COMMISSION et al.

No. 7223.   Decided March 2, 1949.   (203 P. 2d 935.)

See 16 C. J. S., Constitutional Law, sec. 490; 41 Am. Jur. 714. Right of public to reimbursement for old age assistance payments, note, 125 A. L. R. 712.

*Grover A. Giles,* Atty. Gen., and *S. D. Huffaker* and *A. John Brennan,* Deputy Attys. Gen., for appellants.

*Lamoreaux & Tuft* and *Max K. Mangum,* all of Salt Lake City, for respondent.

PRATT, Chief Justice.

This proceeding was commenced under our "Declaratory Judgment" statute. It involves our Public Assistance Act of 1947, L. of U. 1947, ch. 89, page 374, as amended by L. of U. 1948, First Special Session, Ch. 9, p. 14. More particularly it is addressed to Section 19 of that act as amended, commonly known as the "Lien Law." The matter was tried to the lower court on a stipulated set of facts. That court declared that Section 19, as amended, contravened our State Constitution, Article I, Section 24, and the Federal Constitution, Section 1 of the 14th Amendment. Apparently the ground for this declaration was that a husband, whose wife lived with him, could not secure aid if his wife refused to sign away her statutory rights to her husband's property; but a husband whose wife did not live with him, might secure aid without his wife's signing her rights away, even though the wives' interest in their husband's property are comparatively speaking, the same.

We quote Section 19, as amended, inviting attention to the fact that the lien is limited to real property:

"Every County Welfare Board shall require as a condition to granting assistance to any old age recipient, that all real property or interests in real property belonging to the applicant shall be pledged to the Board as a guarantee for the reimbursement of assistance received; provided, however, at the time said lien is satisfied there shall be a $300.00 assessed valuation exemption which shall represent or equal a cash exemption value of $750.00.

"To evidence such pledge the county board shall require each applicant to enter into agreement in form approved by the State Department duly acknowledged so as to entitle it to be filed of record in the office of the County Recorder by which the applicant shall

acknowledge and agree that such property has been assigned as security for the reimbursement of all assistance thereafter received by him.

"If the applicant is a married man his wife shall be required to become a party to such agreement for the purpose of releasing her statutory right in such property and such release and joinder shall be as valid and effectual to release such statutory right as if she had joined the applicant in the conveyance of the property to a third person; provided, that when it appears to the County Board that the applicant is living apart from his wife and her joinder cannot be obtained, the agreement signed by the applicant alone may be accepted under such regulations as the State Department may prescribe.

"Upon making a grant of old age assistance the Board shall forthwith file with the County Recorder of the county in which the applicant resides and with the County Recorder of any other county in which the applicant owns real property, a verified copy of such agreement to reimburse and the filing of the same shall have the same effect as a lien by judgment on any real property in which the applicant has any title or interest. All such real property shall from the time of filing of such copy of agreement be and become charged with a lien for all assistance received by the applicant as herein provided, which lien shall have priority over all unrecorded encumbrances. All such instruments shall be recorded in a special lien book kept for such purposes and no fees or costs shall be paid for such filing or recording.

"(b) Upon the request of a recipient the Board shall execute and file with the county recorder a certificate in form approved by the State Department certifying as to the amount of assistance given the recipient to the date of such certificate. The amount so certified shall constitute the entire claim as of the date of such certificate against the real property of the recipient, and any person dealing with the recipient may rely upon such certificate as evidencing the amount of the existing lien against the real estate of the recipient.

"The County Board shall seek foreclosure of the lien on a recipient's property when the property is transferred to a third party prior to the recipient's death.

"Upon the death of any recipient the County Board shall present a verified claim for the total amount of all assistance given the recipient to the executor or administrator of the estate of such decedent and the same shall be allowed, approved, filed and paid as other claims in the administration of the estate of such decedent.

"All moneys received from such estates or from the foreclosures of such lien shall be reported promptly by the Board receiving the

same to the State Department and the proportion of such money which was paid to the recipient from state funds shall be remitted forthwith to the State Department.

"The State Department shall certify promptly to the State Auditor a statement of the amounts received from such recipients or from their estates and deposit such collections with the State Treasurer. The Federal Government shall be entitled to and shall be paid a share of such collections equal to not more than one-half of the amount collected, if required as a condition to federal financial participation, and this amount shall be certified by the State Department to the state auditor and treasurer.

"The County Board shall be empowered to accept voluntary conveyance of real property in lieu of assuance of execution. All real property acquired by the Welfare Board under the provisions of this act may be disposed of by public or private sale under such rules and regulations as may be prescribed by the State Department. The County Board is authorized to execute and deliver any and all documents necessary to convey title to any and all such property as may have come into its possession to a purchaser of such property as though such board constituted a corporate entity.

"Effective as of July 1, 1947, all old age recipients and all those subsequently applying for assistance who are not exempt as hereinbefore provided, shall be required to enter into agreements to reimburse as hereinabove provided as a condition precedent to receiving any assistance under this act but such agreements shall constitute a charge and lien only for assistance subsequently rendered and not for assistance rendered prior to the execution of such agreements.

"(c) All records relating to the administration of public assistance shall be regarded as confidential and shall be protected against misuse by rules and regulations established by the Public Welfare Commission which shall have the same force and effect as law. Any person who violates the confidential nature of public assistance records as provided herein or by the rules and regulations of the Public Welfare Commission, or who assists anyone else in such violation, shall be judged guilty of a misdemeanor and shall be fined not more than $300 or shall be imprisoned for not more than sixty days, or both.

"Neither the provisions of this Section or the rules and regulations of the Public Welfare Commission shall prohibit the State Department of Public Welfare or the County Department of Public Welfare from publishing or causing to be published such statistical material or other information of general character as Welfare Commission may consider to be of public interest. The applicant or recipient and his attorney shall at all times have the right to in-

spect his application or other personal records after they have been filed."

The facts of this case, as they were stipulated in the lower court, are:

Plaintiffs (respondents) are both over 70 years of age. They maintain a family home in Salt Lake City, having an assessed valuation for the year 1947 of $645, and a reasonable cash valuation of $1200. There is no question about their being entitled to assistance under the act. Section 4 of the act sets out the rules for determining those to whom assistance shall be given. We quote that section, inviting attention to the clause "exclusive of the home owned and occupied by the applicant or recipient":

"Public assistance shall be provided under this act to any needy individual in the State who does not have sufficient resources actually available for his use, to maintain a minimum standard of living compatible with health and well-being. Ownership of money or other tangible property or its equivalent in real or personal property, exclusive of the home owned and occupied by the applicant or recipient, and the furniture and furnishings therein up to but not to exceed $300.00 for an individual living alone or $600.00 for two or more persons living together as a family unit, and life insurance policies up to but not to exceed $500.00 in aggregate cash value for an individual living alone or $1000.00 for two or more persons living together as a family unit, shall not disqualify an applicant or recipient from receiving assistance under this act; provided, that the income from such property, together with any other income or resources actually available to the applicant or recipient be insufficient to provide him with a minimum subsistence compatible with health and well-being. The Public Welfare Department may grant public assistance on a temporary basis to an applicant or recipient owning or possessing personal or real property or life insurance in excess of the amounts designated herein if and when in its discretion such action will be for the best interest of the recipient and the State. The provisions of this section shall apply to payments from the effective date of this act."

Applicants were notified in April of 1948, that it would be necessary for them to sign an affidavit declaring their real and personal property and that they would be required

to sign a lien on their real property. This was done pursuant to a bulletin from the Utah Public Welfare Commission (No. 197) dated March 30, 1948. The bulletin indicated to the County Welfare Boards that lien agreements had to be signed before the recipient of assistance would be given his assistance check for June, 1948.

The plaintiffs, being in need of assistance, did in fact sign the lien agreement and made their affidavits, and received and are now receiving old age assistance.

Is Section 19 unconstitutional?

It is argued on behalf of the constitutionality of the act that there exists no inherent right to public assistance which is legally enforceable (41 Am. Jur. 707); that such right is at best only a statutory right. (See: *Bila* v. *Young*, Cal. App., 1942, 120 P. 2d 904; *Kelley* v. *State Board of Social Welfare*, 1947, 82 Cal. App. 2d 627, 186 P. 2d 429; *Colorado Public Welfare Board* v. *Viles*, 105 Colo. 62, 94 P. 2d 713); and that as it is only a right which may be conferred by the Legislature, the Legislature may impose such conditions to the granting of that relief and assistance as it sees fit.

Respondents concede the general rule to be that the existence of the right is dependent upon statutory authorization. They contend that the legislature, by the Public Assistance Act of 1947, established the right to assistance, and in consequence there does exist a legally enforceable statutory right in anyone who comes within the classification, and meets all requirements which may be constitutionally imposed. In support of this claim they refer the court to the case of *People ex rel. Heydenreich et al.* v. *Lyons*, 374 Ill. 557, 30 N. E. 2d 46, 132 A. L. R. 511, where the court recognized the right of a would be assistance recipient to challenge a residence requirement; and *Sacramento Orphanage & Children's Home* v. *Chambers*, 1914, 25 Cal. App. 536, 144 P. 316, where a residence requirement was allowed to be attacked and held unconstitutional in a case involving aid to orphans.

It should be kept in mind that the issue we are discussing here is not that of one group being entirely excluded from the law and another not; but that the controversy is as to restrictions imposed on one class of a group all of whom are within the operation of the law.

The appellants of course contend that the conditions imposed by the original act and the 1948 amendment (Sec. 19) are valid and that there is a reasonable basis for the discrimination. The respondents contend that there is an unfair discrimination—that no power existed in the legislature to require the signing of a lien by owners of real property whereas no provision is made for a like repayment on the part of (1) persons acquiring money after having been paid assistance; or (2) people acquiring other property after having received assistance. In other words, it is contended by the respondents, that if the Statute had required reimbursement to the state out of all assets of the estate of a decedent who has received assistance, then this would be constitutional (See the Idaho case of *State ex rel. Nielson* v. *Lindstrom,* Idaho, 191 P. 2d 1009) ; but that a law which allows all who have subsequently acquired property or money to escape repaying, while requiring those who owned real property at the time of receiving assistance to give a lien upon that property amounts to an unfair discrimination.

This argument is advanced together with that which apparently was the foundation of the lower court's decision— that is a discrimination as between married men whose wives refuse to sign their rights away.

Before entering upon a discussion of legal principles applicable to this case, let it be mentioned that we are not concerned with a comparison between the applicant who owns real estate, not used as a home, of a value of $300 with the applicant who owns personal property of $300 in value— a comparison made by respondent. It is true that the real estate owner has to sign a lien ; but that lien means nothing as the value of the real estate does not exceed his real estate ex-

emption (see Sec. 19). If it did exceed his exemptions, then he would be cut off from the rolls as not being a needy person, and could not be in the position of collecting money from the state he did not have to pay back. It seems clear that the real question is found in the situation of the home owner, whose property exceeds the exemption value.

Upon the general question of unconstitutionality by reason of discrimination we have several pronouncements of this court, but not involving such a factual situation as is here presented. In the case of *Lyte* v. *District Ct. of Salt Lake County,* 90 Utah 369, at page 375, 61 P. 2d 1259, at page 1262, petition for rehearing denied, 90 Utah 377, 62 P. 2d 1117, this court said:

"* * * The law is well established that the Legislature has authority, within constitutional limitations, to make classifications when and only when the classification rests upon some ground of difference having a fair and substantial relation to the subject of the legislation."

In *State* v. *Mason,* 94 Utah 501, 78 P. 2d 920, 923, 117 A. L. R. 330, this court considered the matter of unconstitutionality of an act of the legislature on the ground of unreasonable discrimination, and announced the following principles:

"* * * to be unconstitutional the discrimination must be unreasonable or arbitrary. A classification is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided the differentiation bears a reasonable relation to the purposes to be accomplished by the act. * * *

"In order to see whether the excluded classes or transactions are on a different basis than those included, we must look at the purpose of the act. The objects and purposes of a law present the touchstone for determining proper and improper classifications.
 * * * * *
"It is only where some persons or transactions excluded from the operation of the law are as to the subject matter of the law in no differentiable class from those included in its operation that the law is discriminatory in the sense of being arbitrary and unconstitu-

tional. If a reasonable basis to differentiate those included from those excluded from its operation can be found, it must be held constitutional."

The above quotations from the *Mason* case are also quoted with approval by this court in the case *State* v. *J. B. & R. E. Walker, Inc.*, 100 Utah 523, 116 P. 2d 766.

We look then to the objects and purposes of the present statutory enactment to establish the propriety of the classification.

The over-all purpose of the Public Assistance Act is stated in Section 3 thereof to be:

"* * * to provide that access to public assistance shall be available to any person in Utah who is in need."

"Need" is defined:

"* * * A person is in need and entitled to public assistance if he does not have sufficient resources available for his use within the limitations set forth in this act, and who otherwise qualifies as hereinafter set forth, to maintain a minimum standard of living compatible with health and well-being."

Sections 6, 7, 8 and 9 (as amended) respectively define old age assistance, aid to the blind, aid to dependent children, and general public assistance. Sec. 19 (quoted above) relates to recipients of old age assistance.

Sections 3 and 4 (quoted previously) establish the class entitled to aid, as all needy persons. This classification is further broken down into three separate classes of needy persons (sections 6, 7, 8 and 9 above)—old age, blind, dependent children, and one general category designed to embrace all other needy persons.

Section 19, however, subdivides one of the separate classes of needy persons (old age) into (1) persons having real estate, and who are required to sign a lien pledging all real property owned by them, and (2) persons having no real property and who hence are not required to sign a lien.

Subdivision (1) (above) of Section 19 has a further qualification: The wife of an applicant living with him shall be required to become a party to the lien agreement for the purpose of releasing her statutory right in such property, but if the wife lives apart from the husband, and refuses to sign, then in that event the agreement signed by the husband alone may be sufficient.

It seems clear, that the legislature in exempting the "home owned and occupied by the applicant" (see Section 4) had in mind that it would be unwise and against public interest to require home owners to dispose of their real property and reduce their possessions to $300 before they would be entitled to aid. Persons who are home owners may be as needy as any other group, yet by the $300 valuation limitation taken alone, they would be precluded from assistance. However, their home property may be worth several thousands of dollars and, if assistance is tendered to them, and they are not required to reimburse the state, then they have a tremendous advantage over persons owning personalty in excess of $300 or realty in excess thereof other than home premises. These latter would be disqualified to receive assistance; the home owner would not. It seems reasonable to say that the purpose of this lien is to put them on an equal footing as to right to receive and yet, in the interest of public policy, not compel the home owner to dispose of his home—that is, not put himself out in the street. If a home owner desires to dispose of his property, the grantee may rely upon the certificate called for by section 19 as to whether or not the lien exceeds the exemption.

The objection is raised that a person having no property and thus not required to sign the lien is not required to pay for past aid received even though he may subsequently receive either money or property equal to the value of the property owned by the old age recipient who owns a home, and has been required to sign a lien. But this again overlooks the fact that during the time each is receiving relief,

they are not on an equal financial footing. From a purely financial point of view the home owner should not receive relief, if his property exceeds the valuation exemption but the State, recognizing that to compel him to dispose of his home, would be very much against public interest, seeks to place them on the same level by compelling the one in the advantageous position to pay back out of that home, all in excess of the exemptioned evaluation. In fact, the home owner, rather than being discriminated against, is in a favored position. It is to the public interest that home owning be encouraged. The object of the law is not reimbursement to the state, but rather to give aid to all needy persons. Present need is the test, and when such persons acquire property and change their status, the law provides for maintaining that equality, if they are still entitled to aid. If by virtue of acquisition of wealth a person no longer needs aid, it should not be the policy of the law to take this away from him and keep him in need of assistance.

Since the classification under the Public Assistance Act of 1947 as amended, as it applies to old age recipients, has a reasonable basis for differentiation between the two classes—real property owners, and non-owners—the act is constitutional so far as classification is concerned.

Our examination of the application of the Act indicates that this is a general law and thus does not come within the purview of Article VI, Sec. 26, par. 10 of the Utah Constitution forbidding special laws changing descent and distribution in any event, although it is questionable that it would come within the provision even if it were a special law—another point raised by respondents.

It is contended that the Act is unconstitutional because of the provision in Section 19, that if an applicant is married, and his wife is living with him, then the wife shall be required to become a party to the agreement for the purpose

of releasing her statutory right in such property, whereas, if the applicant is living apart from his wife and she refuses to sign, then in that event the agreement signed by the applicant alone may be accepted subject to such regulations as the State Department may prescribe. The contention is made that this portion of Section 19, is unlawfully discriminatory as between the two husbands, and also as between the two wives. As between the wives it is contended that since the wife not living with her husband need not sign and can preserve her statutory right, she is given an advantage over the wife who must sign in order that her husband receive assistance, and releases her statutory rights. As between the husbands, it is contended that the husband whose wife lives with him and refuses to sign is discriminated against in that he cannot receive assistance at all, and thus his right to assistance is controlled by the whim of a third person.

In determining the reasonableness or unreasonableness of this provision we cannot divorce ourselves from the practical situation under which this or any other similar type act must operate. It is the ordinary circumstance that where parties are married and living together both are participating in the benefits of any income brought into that unit. So also with old age assistance. In the vast majority of instances the benefits of payments to the recipients will almost of a certainty be shared in equally by the wife, and to require the wife's signature under such circumstances to provide for operation of the lien without interference by her statutory rights is clearly proper, otherwise the effectiveness of the lien will be greatly impaired.

The Legislature has viewed realistically the possibilities where the husband and wife do not live together, and where the husband cannot secure the wife's signature, and has provided an exception within the control of the state department to provide for such contingencies. In the instance of the two living together, the wife is participating and is a part of the unit, and ordinarily there is

harmony between the parties and a division of the benefits between them. Presumably the signature of the wife is obtainable. In the other case, however, where the parties are living apart, there is usually disharmony. The wife will not be sharing in the benefits, and the positions of the parties are such that the husband will be unable to secure the wife's signature. It seems rather obvious then that there are reasonable grounds for making a distinction between the two.

Respondents advance the argument that this act is a loan of credit forbidden by Article VI, Section 31, of the Utah Constitution. With this we cannot agree. See: *State ex rel. Nielson et al.* v. *Lindstrom,* Idaho 1948, 191 P. 2d 1009; *City and County of San Francisco* v. *Collins,* 216 Cal. 187, 13 P. 2d 912; *Bowman* v. *Frost,* 1942, 289 Ky. 826, 158 S. W. 2d 945. The object to be realized by the act is aid to needy persons over the age of 65 years, and the lien provision provides a means to equalize that aid in the best possible manner. If money can be *given* to the aged in the interest of public welfare, it is hard to see how doing less than that—loaning it to them, is bad. The purpose of the acts to uphold the State's moral obligation to look after its needy. This is its public purpose. The following quotation from 21 R. C. L. 701, quoted with approval in *Bowman* v. *Frost,* supra, is illustrative of this moral obligation and public duty:

"The care of the state for its dependent classes is considered by all enlightened people as a measure of its civilization, and the care of the poor is generally recognized as among the unquestioned object of public duty, but in spite of this, the duty under the common law was purely moral and not legal. There is therefore no legal obligation at common law on any of the instrumentalities of government to furnish relief to paupers. The obligation to support such persons results only from statute. The reason for this seeming barbarity of the common law was that matters of charity were thought more appropriate for the church."

. We hold the act to be constitutional and enforceable. Judgment of the lower court is reversed.

Each party to bear his own costs.

LATIMER, J., concurs.

WADE, Justice (concurring).

I concur. But in my opinion the Public Assistance Act of 1947, as amended in 1948, creates an obligation against the estate of every recipient to repay the total amount of public assistance received by him during his lifetime. I also think that the most serious problem on the constitutionality of this statute is whether it unjustly discriminates against old age recipients who own real property as distinguished from other recipients. Neither of these problems are discussed in the briefs or the prevailing opinion, but it was assumed that this act created no obligation to repay assistance received other than that created by the lien provisions.

Chapter 89, Laws of Utah for 1947, designated the "Public Assistance Act of 1947", repealed a number of chapters and re-enacted with some changes in one act what had been in several chapters and added some new matters. Thereafter, Chapter 9 of the Special Session of 1948 amended a number of the sections of the 1947 act. The sections referred to herein are to sections of the 1947 act except where it is pointed out to be otherwise.

Section 1 defines the terms "Recipient" and "Assistance" as follows:

"'Recipient' means any person who is receiving assistance under the terms of this act.

"'Assistance' means payments made to or in behalf of needy persons as defined in this act."

Section 3 authorizes assistance to "any person in Utah who is in need."

Section 4 limits the amount of real property and personal property and insurance which a person may own and still

receive assistance but authorizes the Public Welfare Department to grant, in its discretion, assistance on a temporary basis to an applicant or recipient who owns property in excess of the amounts designated when it will be for the best interest of the recipient and the state. Section 5 authorizes the taking of a lien on the home of the recipient to secure the capital investment when it is necessary for the board to invest money in such home either as payment of a mortgage, contract, or for improvements to make the home habitable. It forbids foreclosure of the lien during the lifetime of the recipient except where the property is transferred to a third person during that time. Section 6 provides for "Old Age Assistance," Section 7 for "Aid to the Blind," Section 8 for "Aid to Dependent Children" and Section 9 for "General Public Assistance." Thus the act provides assistance to four separate and distinct classes of persons in need. Section 9 was amended in 1948.

Section 19 also amended in 1948, is set out in full in the prevailing opinion. It is divided into three subdivisions designated (a), (b) and (c). Subdivision (a) requires as a condition precedent to the granting of assistance to *any old age recipient,* that the applicant pledge all of his real property or any interest therein as security for the repayment of all assistance thereafter received by him, with an exemption therefrom of $300 assessed valuation and $750 cash valuation. Subdivision (b) requires the Board upon the request of a recipient, to file with the County Recorder a certificate showing the amount of assistance furnished such recipient to date, and for immediate foreclosure of the lien in case the property covered there is transferred to a third party prior to recipient's death. It further provides as follows:

"Upon the death of any recipient the County Board shall present a verified claim for the total amount of all assistance given the recipient to the executor or administrator of the estate of such decedent and the same shall be allowed, approved, filed and paid as other claims in the administration of the estate of such decedent."

The above quoted paragraph, definitely requires the repayment of all assistance received the same as other claims in the course of administration of the estate of every recipient. While the first part of this section expressly deals only with old age recipients this part expressly deals with any recipient. It is in no way limited to claims which are made a lien on real property belonging to the estate but expressly requires that

"upon the death of any recipient the County Board shall present a verified claim for the total amount of all assistance given the recipient."

In many estates there is no lien against any property thereof, because the only lien provided is against the real property of the recipient owned after the effective date of this act and covers only assistance received while such property is so owned and applies only to old age recipients, and cases where a capital investment is made on recipient's property. Such liens do not cover after acquired property of any recipient whether real or personal, nor any personal property, nor do they cover the real property of any recipient except old age recipients, and in cases where a capital investment is made in the home of a recipient. This paragraph covers assistance given to all recipients whether old age, blind, dependent children or general public assistance; it provides for the payment as of other claims in the administration of the estate of such recipient, without regard to whether there is a lien against the property or not. It further requires that the claim be made for the "total amount of all assistance given the recipient." This is broader than the requirements of the lien as it only covers assistance given after the contract therefor is made. This paragraph is entirely inconsistent with the idea that it was intended only to provide for the repayment of assistance secured by a lien against the real property of the recipient.

The purpose of this paragraph could not have been merely to provide for the repayment of the assistance secured by

a lien against recipient's real property without foreclosure thereof. If such were its purpose, surely such lien would be mentioned and the recovery of payment in some way limited to such liens. On the other hand if such were the purposes of the legislature this paragraph was entirely unnecessary because that is amply provided for under the provisions governing the probation of estates generally.

Section 102-9-5, U. C. A. 1943, deals with the contents of claims against estates, expressly providing for claims secured by a mortgage or other lien. Section 102-9-11, U. C. A. 1943, prohibits any action on a claim which has not been presented to the executor or administrator, except on a mortgage or lien to enforce the same where all recourse to other property of the estate is expressly waived. Section 102-9-15, U. C. A. 1943, makes the effect of a judgment against the personal representative of the decedent the same as an approved claim against the estate, and prohibits an execution thereon and provides that it creates no lien or priority on the property of the estate. Section 102-9-21, U. C. A. 1943, provides for the payment of funeral expenses and expenses of last sickness and family allowance before any other claims, and Section 102-9-22, U. C. A. 1943, makes the order of payment of other debts against the estate as follows: (1) Wages, (2) Debts having a preference,

"(3) all debts which are liens upon the real property occupied, selected or set apart as a homestead. (4) all other debts which were liens on the property of the decedent at the time of his death. (5) All other demands against the estate."

Section 102-9-23, U. C. A. 1943, provides as follows:

"Debts secured by liens or encumbrances on the property occupied, selected or set apart as a homestead must be paid out of the funds of the estate; and such liens or encumbrances shall only be enforced for any deficiency remaining after such payment. The preference given in the preceding section to debts secured by liens on other property shall extend only to the proceeds of the property affected by such liens, and to the extent thereof, and, if such proceeds are

insufficient to pay the liens, the part remaining unsatisfied must
be classed with other demands against the estate."

It is clear from the foregoing that liens against home-
stead property must be first paid out of other funds of
the estate and the homestead left intact where the other
property is sufficient for that purpose, and that liens
against other property are preferred to the extent only
of the proceeds of the property affected thereby. Under
these provisions it is clear that the administrator could pay
the claims for assistance which were secured by a lien
against the real property of the decedent without the enact-
ment of this paragraph in Section 19 and that it does not
aid in effecting that purpose. I therefore conclude that
the intention of the legislature in enacting that paragraph
was to make all assistance given to any recipient payable
after his death under the provisions of subdivision (5), of
Section 102-9-22, U. C. A. 1943, the same as other claims
in the course of the administration of the estate.

The history of this paragraph also definitely indicates
that the purpose was not to merely provide a means of
recovering assistance which was secured by a lien under
this act. Chapter 89 of the Laws of Utah, for 1937, pro-
vided for old age assistance and Section 18 thereof, now
Section 76A-3-21, U. C. A. 1943, provides as follows:

"No recipient under this act shall be required or asked to reimburse
the state for any of the assistance received hereunder, except wherein
said recipient has received assistance fraudulently or contrary to
the terms of this act, and no lien or mortgage shall be taken on the
estate of the recipient as a guarantee of repayment; provided, estate
has a combined assessed valuation of less than $3,000."

Section 19 of that Chapter, as amended by the Laws of
Utah for 1941, c. 74, now Section 76A-3-22, provides as
follows:

"Upon the death of any recipient, where there is no descendant
of the first and second degree in the direct line and where the estate
of the decedent is a home and furniture, the combined value of which
is $3,000, the commission, or the county or district board which paid

the decedent assistance under this act, in behalf of such department, shall present a verified claim for the total amount of all such payments so made to the executor or administrator of the estate of such decedent and the same shall be allowed, approved, filed and paid as other claims in the administration of the estate of such decedent."

Chapter 90 of the Laws of Utah for 1937 covers assistance to dependent children, needy blind, and other destitute persons. After providing such assistance by Section 15 of that chapter, now Section 76A-3-47, it provides as follows:

"Upon the death of any recipient other than dependent child the director or some other officer of the county or district department which paid the decedent assistance under this act, in behalf of such department, shall present a verified claim for the total amount of all such payments so made to the executor or administrator of the estate of such decedent and the same shall be allowed, approved, filed and paid as other claims in the administration of the estate of such decedent."

From Section 76A-3-21 quoted above, it is clear that it expressly deals with the question of when assistance received by recipient may be recovered. Then Section 76A-3-22, dealing directly with the recovery from the estates of recipients who have been furnished assistance, provides for such recovery under limited circumstances in almost exactly the same words as the paragraph above quoted from Section 19 of the 1948 enactment. The same provision for the recovery from the estates of recipients who have received assistance, with some limitations thereon, is again provided for in Section 76A-3-48 above quoted in almost exactly the same words. Neither of these provisions deal with the recovery of assistance given, which was secured by a lien on the property belonging to such estates because at that time there was no provision for any such lien. Since the 1948 provision is copied so nearly from the previous statutes above quoted, it is evident that the legislature intended to deal with the same subject matter as the previous statutes which was the recovery of assistance generally given to recipients out of their estates and

did not intend to limit such recovery to such sums thereof which were secured by a lien.

If the foregoing is a correct construction of this statute, then all the questions of unjust discrimination in cases involving after acquired property are eliminated, because in all such cases all assistance given to a recipient must be repaid out of his estate, if any, after his death. So the only serious constitutional problem presented is whether there is unjust discrimination against old age recipients who must give a lien on all their real estate as a condition precedent to being granted assistance, whereas the other three classes of recipients are not required to give such a lien. If such discrimination there is, it is not nearly so great under the construction of the statute above made as under that assumed in the prevailing opinion. Still we do have that problem. I have no difficulty in finding a reasonable distinction between a dependent child or a blind person who receives assistance and an old age recipient, but in many cases recipients receiving assistance under the classification of General Public Assistance, are not distinguishable in their facts from old age recipients. Thus the person just under 65 years of age who becomes incapacitated on account of ill health, is not substantially different from a person who is incapacitated for the same reason who happens to be over that age. Yet one has to give a lien and the other does not.

However, the fact that there may be similar cases falling in different classifications does not make the classification undistinguishable. The test is whether the two classifications taken generally present a reasonable basis for distinction. Thus in the General Public Assistance classification, the assistance received thereunder is generally more of a temporary nature, the persons receiving such assistance are usually more apt to soon become self supporting and in order to aid them in becoming self supporting the legislature may reasonably not require a lien against their real property and still require such a lien against the

property of an old age recipient where the probability in most cases of them becoming self supporting is not so great. The fact that the borderline cases in the two classifications may not be distinguishable does not render the whole classification unjust discrimination if the cases generally are different. It is often necessary in order to make classifications to draw an arbitrary line between the two classes. I therefore conclude that this act does not offend against the constitution of this state or of the United States.

WOLFE, Justice (concurring in the result).

I concur in the conclusion that there is no unconstitutional discrimination in limiting the lien requirement solely to the owners of real property. Since I approach the questions posed by the appeal differently than does the author of the prevailing opinion, I prefer to base my conclusions on my own reasoning.

A lien on realty is not an object in itself like real estate. It is something intangible. It is a short way of saying that one has a right to resort to the specific property of another (the property subject to the lien) for the payment of a debt, obligation, reimbursement or other sum. For reasons which I shall presently point out, there is no arbitrary classification involved in requiring, on the one hand, only those owning real estate to agree to permit the state to reimburse itself from the said real estate for assistance given; and on the other hand, not requiring nonowners of real estate to guarantee reimbursement. In short there is no arbitrary classification involved in requiring occupying home owners to comply with the giving of a lien as a condition for receiving assistance. I shall hereafter in this opinion refer to this as the "lien condition."

The enlightened policy reflected by the Public Assistance Act of 1947 in providing needy individuals in this state over the age of sixty-five years who do not have sufficient resources actually available for their use to maintain a

minimum standard of living compatible with health and well being and including provisions for the aid to the blind, dependent children and other public assistance was in its nature revolutionary as compared with the old haphazard, unsocial, unintelligent and inhumane methods symbolized by the poor house, the infirmary, loan of children to industry and other practices noted by Charles Dickens and accepted as necessary and inevitable during and before his time. The history of many thousands of the cases of the aged was a history of pathos and misery during the twilight of their lives. At least we have come a little way along the road toward realizing our duty to society's unfortunates. But the aid must necessarily come out of the public funds and ultimately out of the pockets of the taxpayers. The legislature deemed it advisable, if not necessary, to place conditions upon this largess—for, in the sense that there was no legal or contractual duty on the part of the state, but only a compulsion of ethics and enlightenment—largess it was.

It is not meant to infer that their legislation might be so drawn as to include an unconstitutional discrimination in the fixing of the lien condition. A red headed man could not legally be exempt from the condition and a black haired man subjected to it. The broad principles set out in *State* v. *Mason,* 94 Utah 501, 78 P. 2d 920, 117 A. L. R. 330, apply to these conditions. There must be a reasonable basis for the differentiation between that class made subject to the lien condition as compared with the class not subjected to it which basis must bear a *reasonable* relation to the purposes to be accomplished by the imposition of the condition. If those subjected to the condition are *similarly situated* to those free from the condition, the differentiation would be without basis and hence arbitrary and therefore unconstitutional. The important, and perhaps some what tricky words in the above passage, is the word, "reasonable", and the phrase, "similarly situated." And they must be invested with meaning in the light of the purposes

to be accomplished by the lien condition. It will later appear as we study Section 19(a) that applicants owning homes are differently situated with respect to the purposes to be subserved by the *condition of requiring a lien* than are those with no property or with not enough personal property to be disqualified as a beneficiary under Section 4 of the Act.

We may see this more clearly if we consider for a moment where the circle is drawn which includes those which may be beneficiaries under the Act and which at the same time excludes all those who fall out of the circle. The circle is drawn to include the aged needy and exclude the nonneedy. And who are the needy? Those who have not sufficient resources actually available to maintain a minimum standard of living compatible with health and well being. And how is that class defined? A person living alone possessing up to, but not to exceed, $300 in money or other tangible personal property or its equivalent in *real* or personal property or with life insurance policies up to, but not exceeding in the aggregate, $500 cash value falls within the circle encompassing the beneficiaries. Also, two or more persons living together as a family unit with up to $600 in money or personal property or non-home real estate or with insurance policies of no more than $1000 in aggregate cash value, also fall within the circle except that a

"home *owned and occupied* by the applicant and the furniture or furnishings therein, but [said furniture or furnishings] not to exceed $300.00 for an individual living alone or $600 for two or more persons living together as a family unit" (italics added),

shall not be included in determining the value of the tangible property or its equivalent in real or personal property which marks the line between eligible and ineligible applicants.

Since one of the very purposes of the Act was to assist the needy of the age of 65 or over, it would seem inevitable

that in order to classify all of the needy of 65 years or over from the non-needy of any age, the inclusion-exclusion lines, which would be required to subserve that purpose must be lines separating those 65 years or over from those under 65, and separating those having no property or property not exceeding a certain worth from those having property exceeding that worth. The age limit could have been fixed at other than at 65, and the property value line at different figures. The inclusion-exclusion line as far as property worth is concerned was not a horizontal one. The legislature did what it must do in almost all classifying. It found it wise to draw a line according to the exigencies.

Thus it admitted into the circle of eligibles individuals living alone who owned no more than $300 worth of money or other tangible property, or its equivalent in real or personal property, and for a family unit it made the dividing line $600, and made likewise a difference in the aggregate cash value of insurance policies which would not disqualify a family unit whereas it would a person living alone. And most significant it did not make eligibility depend on the value of a home *owned* and *occupied*.

While there may be some doubts as to the meaning of some of the phrases of Section 4, it appears quite definite that a home owned and occupied by an applicant individually or as a family unit regardless of value, and whether encumbered or unencumbered, does not disqualify such applicant from receiving assistance. It is notable that none of the applicants, disqualified because of ownership of property beyond the amounts specified, has contended that an unconstitutional classification results because other applicants owning and occupying a home worth far more than the specified limits of personal or real property (not used as a home) are admitted within the circle of beneficiaries. In short, a person or family unit may be admitted to the eligible group of needy even though the value of the home owned and occupied is far greater than the value of the money or other personal or real property (other than an

occupied home), ownership beyond which amount would disqualify an applicant who did not own and occupy a home. No one has yet contended that the home owner· eligible for assistance despite the fact that he is permitted to own a home of undefinite value so long as he or his family occupy it, is not similarly situated in respect to the *purposes* of the Act as is his less fortunate non-home owning neighbor; nor that applicants owning and occupying ·homes up to any value are in a differentiable class from those who own nothing or who own real property not used for a home or personal property not exceeding the limits set out in Section 4. "Similarly situated" does not mean situated exactly the same or identically situated. If that were so, applicants would all have to own the same amount and perhaps the same kind of property. "Similarly situated" as applied to the main purpose of the instant act, means all applicants must have arrived at the required age and all must have the common quality of being "needy." So long as the Act draws the circle of inclusion to take in such persons provided needy is reasonably defined in view of the purposes of the Act and reasonably calculated to· effectuate them, there may be variations to the type and kind of property owned up to the limits set and seemingly with no value limit as to a home owned by the recipient, and occupied by him or by him and his family.

Said Mr. Justice Stone in upholding unemployment compensation legislation having in mind that he was dealing with a statute conferring benefits rather than one imposing obligations:

"* * * the legislature is not bound to occupy the whole field. It may strike at the evil where it is most felt * * *, or where it is most practicable to deal with. * * * It may exclude others whose need is less * * * or whose effective aid is attended by inconvenience which is greater." *Carmichael* v. *Southern Coal & Coke Co.*, 1937, 301 U. S. 495, 57 S. Ct. 868, 877, 81 L. Ed. 1245, 109 A. L. R. 1327, 1339.

It is generally recognized that a law is not unreasonably discriminatory just because the legislature has not included all possible classes and situations:

"* * * every legislative act is in one sense discriminatory. The Legislature cannot [in one act] legislate as to all persons or all subject matters. It is inclusive as to some class or group * * * and exclusive as to the remainder." *State* v. *Mason*, 94 Utah 501, at page 507, 78 P. 2d 920, at page 923.

See also *State* v. *Walker*, 100 Utah 523, 116 P. 766, and the following statement from Van Cott, Constitutional Law (1948), p. 148:

"A classification having some reasonable basis does not offend against that [the equal protection] clause merely because it is not made with mathematical nicety, or because in practice it results in some slight inequality."

I am inclined to believe that in legislation such as that with which we are now dealing, designed to grant assistance to groups according to the circumstances which attend their needs, the allowable lines of differentiation need not be drawn as rigidly as in those cases where any substantial disparity of treatment in regard to those similarly situated would give rise to economic advantage to some in the class and corresponding economic disadvantage to the remainder. In the instant case variations in the lines differentiating one class from another would not result in disturbing competitive positions of the members of a class or throw out of adjustment the balance of previously existing relationship of burdens, obligations or privileges between classes or between members of the same class.

To bring the matter into the realm of the concrete, the placing of a lien on the home of an applicant leaves him economically in a less advantageous position than he would be if the lien had not been imposed, but does not materially affect his economic position in reference to any of the fellow members of the class in which he is placed. An applicant with no property or with property not in excess of

the disqualifying limit or even with property in excess of the qualifying limit, and hence out of the circle of beneficiaries, is no worse or better off than he would be if the applicant compelled to give a lien were not so required to give it; nor is any applicant required to give a lien any worse or better off because some other applicant is compelled to give a lien. The requirement that certain applicants give liens does not economically disturb anyone in or out of the circle of beneficiaries. It does disturb the giver of the lien in that he is not as well off as he would be if he did not have to give a lien. The change in the status of the lien giver economically or legally affects only himself and not the legal or economic position of any other beneficiary in the circle or any person out of it.

The purpose in most cases of classification is to so draw the lines that persons or entities situated substantially in similar economic, legal or competitive positions in reference to the objects to be accomplished are treated alike in that they are grouped in the same class so that their competitive economic positions will remain relatively the same insofar as the impact of the legislation upon them is concerned. We have no such problem in the instant case.

In view of what was above said, we now return to a consideration of the question as to whether the requirement that the home owner give a lien on the home occupied by him and/or his family as a condition of receiving assistance works an unconstitutional discrimination against such home owner and in favor of the non-home owner applicant. It can be seen now that various parts of the act form a pattern. The legislature meant to utilize for the eligible applicants their homes if they were used or occupied as such. That may have been the main reason why no limit was placed on the value of the home as a factor for eligibility. It was the legislative policy to keep the home intact. The legislature may have reasoned that there was no necessity to put any limit on the value of the home used and occupied as such as a condition of such home owning applicant re-

ceiving assistance because the state could require that it be security for the assistance given, less exemptions up to the value of the home. That may have been the very reason why the legislature in Section 4 included in the group of eligibles those who owned and occupied a home without limit of value if they were otherwise needy. The legislature could have required every home owner to surrender his home or some part of the value thereof as a condition of eligibility to receive assistance. It did not do so. It chose rather to leave the title and the right of occupancy of the home to the owner and his family, and then take a lien for reimbursement of assistance given which would be satisfied after the applicant's death or at the time he might desire to transfer the home.

I do not mean to infer that, absent a lien requirement, there would be an unconstitutional discrimination in favor of the home owner and against the non-home owner in respect to eligibility for assistance. I am simply pointing out that the legislature may have thought that as a quid pro quo for permitting the home owner to take his home with him into the circle of beneficiaries, it was only fair and more equitable to the non-home owners—the poorer applicants—that the home owner be required to give this lien as security for reimbursement. This idea is suggested in the main opinion, that the requirement was for the purpose of placing the non-home owning group on a more equal footing with the home owning group.

I think, however, that the main reason for the lien to secure reimbursement was that of economy.

Public welfare costs were mounting and state funds for the program were running low. The barrel of public funds is not bottomless nor are the more ultimate resources from which those funds are derived limitless. In order to make the benefits available to all needy aged and in adequate amounts, the lawmakers had to consider ways and means of effecting savings. They found from previous experience

(the lien requirement in force before the repealing act of 1937, sec. 76A-3-21, Utah Code Ann. 1943) that liens can be helpful in two ways: (1) Directly, to refill in part at least the coffers of the public treasury, and (2) indirectly, to relieve the assistance rolls of those whose prospective heirs prefer to support their relatives (see 91-0-1 Utah Code Ann. (1943), rather than go without their inheritance. For the reasons stated above, I think the classification between those in the circle from whom liens are required and those not required to give them is constitutional.

It is contended that the third paragraph of Section 19 (a) is unconstitutional in that it provides that if the applicant is a home owning married man, his wife shall be required as a condition to his obtaining assistance, to join him in the agreement giving the state a lien unless he is living apart from his wife and her joinder cannot be obtained. It is contended that this is discriminatory as against the wife who adheres to her husband since she signs away her inchoate rights whilst the wife who is maritally separated retains her right. It is true that there is a discrimination, but it is not unreasonable and unconstitutional. It is a discrimination which arises out of the necessities of the case—out of the necessity for obtaining an effective lien. Security of the property for reimbursement would be ineffective if the state could not pass a good title free from encumbrance of dower.

We are not concerned with legislative policy in this regard, but only with its powers. Whether, under the general policy of holding a family together which is inherent in the act and for that reason permitting the applicant to retain his home, the requirement that the wife who cleaves must surrender her statutory interest may not, in older married couples, lead to fictitious separations for the purpose of retaining some portion of the property and thus be a force working against the general social policy inherent in the Act is not for us, but for the legislature to determine. The legislature must have thought that in people who have

reached the age of 65 the probability that such a provision would encourage separation, and especially by connivance, would be comparatively rare. The legislature must have weighed against those factors the consideration that where the wife lives with her husband she would, in the great majority of cases, share his assistance payments especially in cases where she has not reached the age of sixty-five. This would itself tend to keep them together even though she surrendered her statutory interest in his home. Also, it must have considered that unless this requirement were exacted of wives still dependent on their husbands, the effectiveness of the lien would be greatly impaired.

I should note here that I am construing the third paragraph of 19(a) to refer only to the so-called statutory right of a widow that is a one-third interest in real estate. I am assuming that the lien agreement does not cover the widow's homestead rights. I think a coerced waiver of those rights might raise quite different questions.

I am satisfied that the third paragraph of 19(a) does not offend against the equal protection provision of the federal constitution. Viewed in the light of the purposes of this classification of wives, the line between adhering and maritally separated wives serves the purpose of the classification. The classification is necessary to accomplish the full purpose of the lien. The two classes differentiated by the circumstances are not similarly situated for, as above pointed out, the adhering wife indirectly, if not directly, receives a benefit from the assistance which the separated wife does not.

One question remains to be considered:

Does the fact that no lien is required from recipients owning real property who receive assistance because they fall into the class of the blind, dependent children or general public assistance, work an unconstitutional classification in the light of the fact that old age recipients owning real property are required to give a lien?

Certainly there is no doubt that dependent children are differently situated as to the purpose of the lien condition than are the needy aged. In the case of a dependent child who happened to own real property, the County Board might have to wait many years before it could collect at his death for assistance rendered during a period most likely ended many years before his death.

The blind, by their very affliction, suffer from handicaps which in many cases extend over a long period of time—perhaps the whole or greater portion of their lives—and even though they may own and occupy their homes, they are in a condition which makes its appeal for the most generous treatment. These last mentioned two categories of recipients and the general public assistance classification, though less apparent, fall into a class not similarly situated as to the real property owning needy aged. These groups, therefore, in view of the purposes, administrative and substantive, to be served by classifications, form constitutionally differentiable classes.

I concur in the holding that the requirement of a lien does not offend against Article VI, Section 26, Paragraph 10 of our Constitution which prohibits special laws changing succession and inheritance. I also concur in the holding that it does not offend against Article VI, Section 31, of our Constitution which forbids a loan of the State's credit in aid of private individuals. This act deals with a broad public and social plan. Furthermore, the assistance is not a loan of credit. The fact that provision is made for future reimbursement of assistance payments up to the value of a house owned and occupied, less $300 assessment value, or $750 cash, does not make it such.

McDONOUGH, Justice (concurring).

I concur for the reasons stated in the opinion of the court and in the special concurrence of Mr. Justice WADE.