353 P.2d 171

**STATE ROAD COMMISSION OF UTAH,**
Plaintiff and Appellant,

v.

**UTAH POWER & LIGHT COMPANY, a corporation, Mountain Fuel Supply Company, a corporation, and The Mountain States Telephone and Telegraph Company, a corporation, Defendants and Respondents.**

No. 9136.

Supreme Court of Utah.

May 26, 1960.

Walter L. Budge, Atty. Gen., of Utah, Franklyn B. Matheson, Robert S. Campbell, Jr., Assts. Atty. Gen., Merlin R. Lybbert, Robert Porter, Jr., Salt Lake City, for appellant.

Gerald Irvine, S. G. Baucom, B. Z. Kastler, Jr., Calvin L. Rampton, Salt Lake City, Sam Cline, Milford, S. N. Cornwall, Salt Lake City, Luis R. Rovira, Denver, Colo., for respondent.

HARDING, District Judge.

State Road Commission of Utah filed an action under the declaratory judgment act to determine the validity of Chapter 53 of the 1957 Session Laws of Utah, now Section 27-2-7, Subsection (22), Utah Code Annotated, 1953, commonly known as the Utility Relocation Act. Summary judgment was rendered in favor of the defendants, holding the Utility Relocation Act to be valid, and ordered the State Road Commission to reimburse the defendant utility companies for the non-betterment costs of the relocation of their facilities. This appeal is taken from the judgment.

The complaint alleged in substance that franchises which are still in full force and effect had been granted by the proper governmental authorities to the defendant utility companies to locate their utility facilities on public roads and streets (the franchises are silent as to any removal or relocation of the facilities); that the facil-

ities had been placed in pursuance of the franchises; that thereafter portions of such roads and streets had been designated as federal aid highways which required the removal and relocation of the facilities; that the defendants had demanded that the plaintiff State Road Commission pay the relocation costs as provided by the aforementioned Utility Relocation Act, which had become effective prior to the time demand for removal and relocation had been made, and the plaintiff contends it cannot legally pay such costs, asserting the unconstitutionality of the Act.

The pertinent part of Section 27-2-7, U.C.A.1953, as amended by Chapter 53, Laws of Utah, 1957, involved in this controversy is as follows:

"(22) (a) To make reasonable regulations for the installation, construction, maintenance, repair, renewal and relocation of all facilities and drainage and irrigation systems (herein called 'facilities') of any utility in, on, along, over, across, through, or under any project on the federal-aid primary or secondary systems of highways as the same now are or may hereafter be defined by Act of Congress, or on the interstate system, as herein defined, including extensions thereof within urban areas. Whenever the commission shall determine that it is necessary that any such facilities which now are,

or hereafter may be, located in, on, along, over, across, through or under any such federal-aid primary or secondary system or on the interstate system, including extensions thereof within urban areas, should be relocated, the utility or political subdivision owning or operating such facilities shall relocate the same in accordance with the order of the commission; provided, however, that the cost of relocation in connection with the highway systems as defined in this paragraph, shall be paid by the commission in all cases where proportionate reimbursement of such cost may be obtained by the state of Utah from the United States pursuant to the Federal-Aid Highway Act of 1956. In case of any such relocation of facilities, as aforesaid, the utility or political subdivision owning or operating the same, its successors or assigns, may maintain and operate such facilities, with the necessary appurtenances, in the new location or locations.

"(b) For the purposes of this section, the term 'utility' shall include privately, cooperatively and publicly owned utilities, including drainage and irrigation systems and utilities owned by all political subdivisions.

"(c) For the purposes of this section, the term 'cost of relocation' shall include the entire amount paid by such

utility properly attributable to such re-location after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility.

"(d) 'Interstate system' means any highway now included or which shall hereafter be included as a part of the national system of interstate and defense highways, as provided in the Federal-Aid Highway Act of 1956 and any acts supplemental thereto or amendatory thereof.

"(e) The cost of relocating utility facilities in connection with any project on the federal-aid primary or secondary systems or on the interstate system is hereby declared to be a cost of highway construction."

The provisions of the Utah Constitution with which the above act are claimed to be in conflict are:

Article VI, Section 27. "The Legislature shall have no power to release or extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or person to the State, or to any municipal corporation therein."

Article VI, Section 31. "The Legislature shall not authorize the State, or any county, city, town, township, district or other political subdivision of the State to lend its credit or sub-scribe to stock or bonds in aid of any railroad, telegraph or other private individual or corporate enterprise or undertaking."

It is to be conceded that the common law required utilities to pay the entire cost of removing and relocating any facilities located within the right-of-way of a public highway whenever the necessities of highway improvement so demanded. New Orleans Gaslight Co. v. Drainage Comm. of New Orleans, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831.

In view of the foregoing constitutional provisions and the rule of the common law, the question to be answered is whether or not the legislature has the power to modify the common law, prospectively, lifting a burden from the utilities and imposing it on the State. This question in whole or in part has been before the highest courts of twelve states in the following cases:

State ex rel. Rich v. Idaho Power Co., 81 Idaho 487, 346 P.2d 596; Opinion of the Justices, 152 Me. 449, 132 A.2d 440; Baltimore Gas & Electric Co. v. State Roads Comm., 214 Md. 266, 134 A.2d 312; Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N.W.2d 642; Opinion of the Justices, 101 N.H. 527, 132 A.2d 613; Wilson v. City of Long Branch, 27 N.J. 360, 142 A.2d 837; State Highway Commission v. Southern Union Gas Co., 65

N.M. 84, 332 P.2d 1007; Lehigh Valley R. Co. v. Canal Board, 204 N.Y. 471, 97 N.E. 964; New York City Tunnel Authority v. Consolidated Edison Co., 295 N.Y. 467, 68 N.E.2d 445; Oswego & Syracuse R. Co. v. State, 226 N.Y. 351, 124 N.E. 8; Transit Commission v. Long Island R. Co., 253 N.Y. 345, 171 N.E. 565; Westchester Electric R. Co. v. Westchester County Park Comm., 255 N.Y. 297, 174 N.E. 660; Northwestern Bell Telephone Co. v. Wentz, N.D., 103 N.W.2d 245; Delaware River Port Authority v. Pennsylvania Public Utility Comm., 393 Pa. 639, 145 A.2d 172; State v. Southern Bell Tel. & Tel. Co., Tenn., 319 S.W.2d 90; State v. City of Austin (State v. City of Dallas et al.), Tex., 331 S.W.2d 737.

As so often happens, there is respectable authority on both sides of the question. The numerical weight of authority holds that under constitutional limitations similar to those in Utah the Legislature has the power to change the common law to relieve the utilities of the obligation to pay the cost of relocating facilities and to impose that cost on the state. Justice Cardozo's opinion in Oswego & Syracuse R. Co. v. State, supra, at page 356 of 226 N.Y., at page 10 of 124 N.E., is expressive of the holding of the majority:

"At the threshold stands a question of constitutional power. 'Neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking.' (Constitution, art. 8, sec. 9.) The state finds in this command a barrier to reimbursement. In the case of the Lehigh Valley Railroad Company, the same barrier was interposed. * * * The court found it unreal. We did not deny the power of the legislature in the improvement of navigation to tear down bridges and other obstructions without requital for resulting loss. * * * We held, however, that the Legislature did not violate the Constitution in refusing to exert the full measure of its might. Mere gifts and benevolences in aid of private undertakings, the Constitution does prohibit. * * * It does not prohibit the recognition of claims which have their roots in equity and justice. * * * This is not a case where the legislature, after building the canal, has voted compensation retrospectively for the expenses of a private undertaking. We say that to exclude a problem, and not to suggest its answer. This is a case where the legislature, by action looking to the future, has defined the terms of equity and justice upon which it will go into an enterprise. In fixing these conditions, the legislature has a wide discretion. * * * Courts will not revise its judgment unless there has been manifest abuse * * *

"This case is governed, therefore, by our decision in that of the Lehigh Valley Railroad so far as the facts of the two cases are the same. The state finds a distinction between them in the terms of the claimant's permit. In the earlier case there was an implied reservation by the state of the right to destroy the bridge in the improvement of navigation * * * In this case the reservation was express. We think the difference is unsubstantial. The power of the state is not changed by the form of reservation. Even though no permit had been granted, the duty of the railroad would be the same. The equity of its position is not destroyed by its promise to obey the law. In such matters we must go beneath the form of the transaction to its substance * * * In form only the duty is contractual. Back of the form of contract there lies the substance of submission to the coercive power of the state. We are not dealing with a free bargain, which has been found afterwards to be a hard one. What the legislature's power of relief or dispensation may be in such circumstances, we need not now determine. We are dealing with a bargain dictated by the law. Between such a case and that of the Lehigh Valley Railroad we find no difference in principle. The state was about to execute a great public work. It saw that in the doing of that work there would be destruction of private property. Much of the damage would be damnum absque injuria. None the less it would be damage. The result would be inequality in the distribution of public burdens. Some would pay more dearly than others in proportion to benefits received. This inequality, the legislature, fixing in advance the conditions of the undertaking, had the power to correct. It might refuse to launch an enterprise at the price of hardship and oppression. There was power to destroy, and leave the loss where it might fall. There was also power to pay for the destruction, and thereby re-establish some uniformity of proportion between benefits and burdens. The question was for the legislature whether the equity of compensation was strong enough to merit recognition. We cannot hold it to be illusory."

In Minneapolis Gas Co. v. Zimmerman, supra [253 Minn. 164, 91 N.W.2d 652] the Minnesota court resolved the constitutional questions raised (which are similar to those raised in the instant case) in favor of constitutionality. It also discussed the "realities of the situation" which would impose unfair burdens on utility customers in those states where the utility relocation

costs were not paid in part from federal funds. Financial distress could be the lot of some of our municipalities and smaller utilities should they suddenly and on a large scale be required to relocate at their own expense non-salvageable sewer systems and other utility facilities which may parallel a highway designated for improvement under the Federal-Aid Highway Act of 1956. That inequities are bound to occur in such a tremendous program was recognized in statements made by some of our U.S. Senators and published in the U.S. Code Congressional and Administrative News, Vol. 2, 85th Congress, 2nd Session, page 2398 (1958):

"In the old days, such relocation costs were encountered on a gradual and small scale. They embraced relatively minor operations in type. Their sum total was within the reach of the utilities' ability to fund same, whether the utility was publicly, privately, or cooperatively owned.

"Under the act of 1956 all of this was heavily changed. A crash program of unprecedented scale was inaugurated. Federal funds available for highway construction rocketed from $875,000 to $2 billion within a single year. Greater increases are scheduled for following years. In addition, the type of construction changed. The modern, multilane, high speed traffic ways require rights-of-way of spectacular width; cloverleafs, overpasses, and underpasses; and long distances thereof through urban areas, bringing expressways to the heart of metropolitan centers.

"These changes brought about inordinate expenditures for moving vast amounts of facilities at a great cost to the users of the utilities. They bring about a tremendously different treatment than when highway improvement was a local convenience and local cost, relatively speaking.

"Under the old order there was not only a smaller cost, but also a greater identity between the users of the utilities affected, and the taxpayer who provided funds for the highway improvement which resulted.

"A special unfairness which results from these costs is attributable to the Interstate Highway System. Some communities and some utilities will pay the entire load. Most of the communities and utilities, many located just a short distance away, will not pay any of the load, and yet they will benefit almost as fully from the construction of the Interstate System.

*    *    *    *    *    *

"Should an Interstate Highway run to the heart of a small utility (it might be an REA, a co-op phone com-

340

pany, or electrical distribution system, or what have you), or through or near a small city or village, it is conceivable that fiscal ruin could be visited upon them."

Of the states which have considered this matter, a minority, Idaho, New Mexico and Tennessee, have held that utility relocation acts like ours are invalid under similar constitutional provisions; whereas, the preponderant majority have held in accordance with the conclusion we reach, based upon considerations discussed below with respect to our concept of highway uses and legislative prerogatives.

We subscribe to the philosophy that the policy of the greatest good for the greatest number in the long run as applied to the forest reserves also applies to the multiple uses available on public streets. Public welfare demands that the people be served with water, sewer systems, electricity, gas, telephone and telegraph, as well as transportation and means of travel. These services are vital to the well-being of our various communities. It would be almost impossible to meet these urgent requirements without making use of the public property. The presence of the utility facilities on the streets constitutes a use in the public interest subject to public regulation, and an object within the purview of a public policy to be established by the legislature.

Also, we are committed to the proposition that the moral obligations of the state are within the realm of legislative policy and prerogatives. We said that Article 6, Section 31, of our Constitution is not violated even when direct gifts and loans of state funds are made to people in need under our Public Welfare Program, because of a public purpose served in discharging, not the legal, but the moral obligation of the state to care for its poor. Wallberg v. Utah Public Welfare Comm., 115 Utah 242, 203 P.2d 935.

Utility relocations are ordered by virtue of the police power of the state. This power must be exercised fairly. The relocations will result in destruction and loss of some of the facilities. Expenditures for engineering, labor, and materials will be incurred. The cost is occasioned at the instance of the state and federal governments for the benefit of all the people. The utilities are in no way to blame that their facilities happen to be in the way of this improvement. We do not deem it to be unfair for the legislature to provide that they be reimbursed for the actual expense of their removal. This presents a question of morality and justice, closely coupled with the interest of the public as beneficiaries, taxpayers, and utility customers. The question is manifestly one for the legislature. It is a case where the state should set the example * * * and should be bound by the same concepts

of justice and morality as its individual members * * * Driggs v. Utah State Teachers Retirement Board, 105 Utah 417, 425, 426, 142 P.2d 657, 660, 661.

The legislature has determined the policy to be pursued in the relocation of utility facilities; and, mindful of the magnitude of the newly inaugurated federal program and the equities to be adjusted, has fixed in advance the terms upon which relocations shall be required. There is no gain to the utilities. They are simply protected from suffering a net loss in the relocation of their facilities, all resulting from this vast and farflung highway building program.

We hold that in enacting the Utility Relocation Act, our legislature remained well within the boundaries of constitutionality as marked by Article 6, Section 31 of our Constitution.

Article 6, Section 27, prohibits the legislature from releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any corporation or person to the state, or to any municipal corporation. The claim that the Utility Relocation Act of 1957 offends this provision by changing the common law rule and requiring the state to pay the non-betterment costs of the relocation of the utility facilities is to argue that all laws which will cause obligations to arise in favor of the state upon the happening of future events are forever frozen as far as the legislature is concerned. This notion would mean that the legislature could enact a law imposing liability in favor of the state for prospective conduct and retain no power of repeal. We are persuaded that this section carries no such implications and does not invalidate legislation concerning transactions or acts yet future.

In the cases of the State v. City of Austin (State v. City of Dallas, et al.), Tex., 331 S.W.2d 737, 742, the court, in construing a constitutional provision similar to our Article 6, Section 27, stated:

"After the occurrence of events which under the law then existing give rise to an obligation on the part of an individual or corporation to the state, the Legislature has no power to release or diminish that obligation without consideration * * * Moreover, the use of public money to pay a claim predicated on facts which generate no state liability constitutes a gift or donation in violation of our Constitution * * * Respondents could not, therefore, be reimbursed for all or any part of the expense incurred by them in relocating their lines prior to the adoption of House Bill 179. But the statute does not operate retrospectively, and respondents claim no reimbursement for costs incurred before it became effective.

342

"Although petitioner argues otherwise, it cannot be said that respondents are under an absolute and continuing legal obligation to relocate at their own expense any utility installments owned by them and situated in public ways whenever such relocation is made necessary by highway improvements. Their use of streets and highways for this purpose is simply subject at all times to a valid exercise of the police power of the state. It is only when the full measure of that power is exerted that they are obligated to make the installations conform to highway improvements at their own expense. This duty would arise upon, and not before, the making of a lawful demand for relocation of facilities. Here the Legislature has empowered the State Highway Commission to construct interstate and defense highways and to direct municipalities and utility companies to relocate their facilities. That grant of authority is conditioned, however, by the requirement that the utilities be reimbursed for the expense which they incur. In our opinion this does not constitute the release of an obligation to the state within the meaning of Article III, Section 55 of the Constitution."

As suggested by the Texas court, once the event occurs which causes the indebtedness to accrue, the liability to attach, or the obligation to subsist, the legislature may be powerless to act in releasing the indebtedness, cancelling the liability, or discharging the obligation. While the event is yet future that may create indebtedness or liability, or invoke obligations, the legislature is unfettered by this section. We are aware of no legal principle which requires that the rule here in question must remain unchanged. The law provides stability without paralysis, flexibility without anarchy.

■ In this case it is admitted that the franchises were granted and accepted with knowledge that they were subject to the exercise of the police power of the state. Among the unwritten provisions, then as now, was that overarching one to comply with the law at all times. What that law would be from time to time, no one knew. What specific acts or other considerations would be required of the utilities was just as unpredictable. "We know in part, and we prophesy in part." When a change in use of the street necessitated adjustment with respect to use by the utilities and a demand for action on the part of the utilities was made, then and only then would an obligation arise and the requirements imposed by the obligation become known. If the law had changed or street uses now unknown were contemplated, the requirements would be affected

accordingly. The utilities assumed that risk to their advantage or disadvantage. The theory that the common law rule as it existed when the franchises were granted became an integral part of the franchises as if expressly written therein, and could not be modified by subsequent legislation, is not supported by the authorities. All contract and property rights are held subject to the fair exercise of the police power of the state. Chicago & A. R. Co. v. Tranbarger, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 1204. Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N.W.2d 642. The Utility Relocation Act does not impair or nullify any obligation, nor does it extinguish or release any indebtedness or liability.

Construing Article 6, Sections 27 and 31 as we do, it is the holding of this court that Section 27–2–7, U.C.A.1953, as amended by Chapter 53, Laws of Utah, 1957, does not violate the Constitution of this State, and is valid. The judgment of the district court is affirmed. No costs awarded.

CROCKETT, C. J., and WADE and McDONOUGH, JJ., concur.

HENRIOD, Justice (concurring in result).

I concur in the result with the following observation: A strong, forceful argument was made by respondents to the effect that relocation costs are an expense of operation. They urged that:

"regulated utilities have no revenues other than the rates paid by their subscribers from which to pay relocation expenses. Under the law. of Utah, utilities are entitled to a fair return on the value of the property devoted to the public service. *Relocation costs are an expense item chargeable to operating expenses or are capital expenses and thus increase the rate base on which utilities are entitled to earn.*"

Taking this language at face value, it is assumed by this writer that the saving effected by elimination of such costs should be cut back to the utilities' *consumers,* not to the stockholders or anyone else, and that a corollary of such contention on the part of respondents would be a *reduction* in the rate base resulting in lower costs to the consumer, and that in fixing the rate, the Public Service Commission should take into consideration such relocation cost savings in revising the rate downward for the benefit of such consumer.

CALLISTER, J., being disqualified did not participate herein.