311 P.2d 370

The STATE WATER POLLUTION CONTROL BOARD of the State of Utah, Plaintiff and Appellant,

v.

SALT LAKE CITY, a municipal corporation, Defendant and Respondent.

No. 8560.

Supreme Court of Utah.

May 9, 1957.

248

E. R. Callister, Jr., Atty. Gen., Raymond W. Gee, Asst. Atty. Gen., for appellant.

Sidney G. Baucom, Donald B. Holbrook, Salt Lake City, for respondent.

CROCKETT, Justice.

This case involves a controversy between The State Water Pollution Control Board and Salt Lake City concerning the City's failure to conform to certain of the Board's regulations pertaining to sewerage systems. The fundamental contention of the City is that it is not subject to these regulations.

The Water Pollution Board was created by the 1953 Legislature. Its declared purpose was to "Control, Prevent and Abate the Pollution of Surface and Underground Waters of the State."[1] Pursuant to the Act,[2] the Board adopted a set of regulations for sewerage systems to which some of the practices Salt Lake City has followed for many years do not conform.

The three regulations which provide the basis for the dispute here are these: (1) prohibiting any cross-connection between a drinking water system and a sewage system; (2) prohibiting the use of any public sewer pipe less than eight inches in diameter; and (3) requiring mechanical ventilation in all underground pump stations.

The City was charged with violating each of the foregoing rules and appeared before the Board for a hearing consequent to which it was ordered to discontinue such practices. In accordance with the provisions of 73-14-11 U.C.A.1953, the City sought in the district court a review and reversal of the order. The court granted its motion for summary judgment on the ground that the Board had no jurisdiction over the City's sewer problems above referred to. From that judgment the Board has appealed.

In arguing that the Water Pollution Act was not intended to give the Board jurisdiction over the internal sewage disposal problems of municipalities, the City calls attention to the fact that it, too, is vitally interested in the prevention of water pollution, the quality of its drinking water, and the health of its inhabitants and has for many years maintained its system in a manner completely adequate for those purposes. It further contends that the things about which this case is concerned create no genuine danger of pollution and that the Board's attempt to impose the regulations in question constitutes an unreasonable intrusion into its internal affairs by a department of state government which is acting on a theoretical basis completely removed from practicalities and the needs of the community.

Appraisement of the City's argument in that regard requires an understanding of

1. Laws of 1953, Chapter 41 (Title); 73-14-1 to 73-14-13, Utah Code Ann.

1953 (Supp.1955) Citations hereafter will be to Utah Code Ann.

2. 73-14-4(g), U.C.A.1953 (Supp.1955).

the charged violations. The first one concerns the use of sewer flush tanks, which equipment has been part of the City's public sewer system for many years, and which it has continued to install in spite of regulations of the Board to the contrary.

The flush tanks operate in the following fashion: At the highest elevation of each sewer line is a cement tank of 100 to 200 gallon capacity which is connected at its bottom to the sewer. Near its top is a tap or faucet on an intake from a one-inch city water line. When the faucet is turned on, water runs into the tank until it reaches a certain level, approximately 10 inches below the faucet; then a mechanical device automatically releases the water, flushing out the sewer line. This operation is done by city employees who visit each tank about once a month. They open the faucets, but do not remain to watch the entire operation; they go about their other duties and return in about an hour, during which time the tank will fill and flush about four times. The City actually takes pride in this particular system and attributes to it the fact that in comparison to other cities it has a very low incidence of sewer cloggings and a minimum of difficulties in that regard. It argues the extreme unlikelihood, if not complete impossibility, of any water pollution from such a flush tank.

Such an occurrence would require the synchronization of a number of unusual events. The sewer would have to clog below the tank and force the sewage water back up through the sewer line into the tank sufficiently to cover the end of the fresh water tap. This would have to occur during the flushing operation when the tap was open; meanwhile there would have to be a break in the water line, and this would have to be at a lower level so that its drainage would cause a suction (they call it negative pressure) in the water pipe which would suck in the sewage. Should all of the foregoing factors occur at the same time, in order for the pollution to occur, it would further require that the workmen also fail to discover or ignore them. Even then it would be hard to see how any polluted water could get beyond the break in the water pipe. There is no record of any such simultaneous combination of circumstances in the history of the City.

The violation relating to size of pipe concerns the installation of two short lines of six-inch sewer pipe. The reason for the Board's 8-inch pipe regulation is that smaller ones are apt to clog, which might result in an overflow of sewage from manholes, and thence through surface drainage facilities and eventually into water courses and thus pollute "waters of the state." The City concedes the desirability of using eight-inch pipe in sewer laterals generally, and such is its practice, but in the two instances installed six-inch pipe in laterals of less than 100 feet length and having a maximum potential of five service connec

tions. It again points to the remoteness of any possibility of water pollution because of this fact, and that it maintains adequate safeguards to keep these sewer pipes clean.

The pump station for which no ventilation is provided, and about which the Board complains, was built by the City to serve the needs of a laundry which was dumping large amounts of hot suds into the sewer. Rather than have them go directly into the sewer line and thus possibly overload it at one time, the City constructed a large tank to discard the suds in. The tank's contents are automatically pumped into the main sewer line after they reach a certain depth. The Board's purpose in requiring a fan or ventilating system is to make it more comfortable and safe for workmen who on occasion must clean or repair the tank. The City considered it unnecessary and impractical to install such a fan for various reasons. It indicates that there is much less danger of gases from the suds of the laundry than there would be from a regular sewer tank and that the large perforated manholes which give the tank continuous natural ventilation are adequate. It also points out that because of the heat from the suds it would be impossible to work on the tank while the laundry was in operation anyway, and further, that the City has never had any difficulty or ob-

jections from workmen in cleaning them. More important than this, the City strongly urges that this has no bearing whatsoever upon or relationship to the possible pollution of public waters, even if such a fan were desirable, and that this regulation epitomizes the meddlesome character of the Board's attempted intrusion into the internal operations of the City Water Department in matters where it has no legitimate concern.

■ Regarding the latitude of the Board's sphere of authority: there seems to be no doubt that the Act was meant to give it jurisdiction over cities for certain purposes. This is manifest by various provisions of the Act: It defines the word person to include bodies politic;[3] it provides for representation of "municipalities" on the Board;[4] it gives the Board jurisdiction over all waters of the state and then proceeds to define waters of the state as "all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, which are contained within * * * this state or any portion thereof * * *;"[5] it states as a declaration of policy that one of its purposes is to maintain and improve the quality of waters for public water supplies;[6] and after giving the Board authority to review plans and specifications for disposal systems,[7]

3. 73–14–2(g), U.C.A.1953 (Supp.1955).
4. 73–14–3, U.C.A.1953 (Supp.1955).
5. 73–14–2(f), U.C.A.1953 (Supp.1955).

6. 73–14–1, U.C.A.1953 (Supp.1955).
7. 73–14–4(i), U.C.A.1953 (Supp.1955).

goes on to define disposal systems to include sewerage systems, which are further defined as including pipelines and pumping stations [8] and treatment works.[9]

The contention of the City is that if the Water Pollution Act is so construed as to give the Board authority to make and enforce such regulations over it as those in question here, the Act is contrary to Article VI, Section 29 of our Utah Constitution:

> "The legislature shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property ·or effects, whether held in trust or otherwise, to levy taxes, to select a capitol site, or to perform any municipal functions."

It is evident that if the Board's position is correct, it would be supervising and in a sense "interfering" with the City's sewer and its operation. It is contended by the Board however, that because the constitutional restriction upon interference with activities of the City above referred to, speaks of "municipal improvements" and "municipal functions" it was meant only to apply to those activities of the municipality which it pursues in a private or proprietary capacity. It reasons that matters concerning health and sanitation to which water pollution relates are of a purely governmental nature and are thus subject to control by the Board, even if it be deemed a special commission.

■ As both parties argue in terms of the distinction between governmental and proprietary functions in order to include or exclude the sewage disposal regulations under the constitutional provision, it is appropriate to inquire into the meaning of the word "municipal" as there used. The cases in which such distinctions are made are usually concerned with tort liability. It is generally recognized that because the municipality acts in a somewhat dual capacity—on the one hand as a subdivision of the state exercising governmental powers, and on the other, engaging in activities similar to those of a private corporation— the sovereign immunity of the state extends to the municipality only when it is acting in a governmental capacity, whereas it is responsible for negligence in connection with any proprietary activity.[10] In that context, the term "municipal function" has sometimes been used as a synonym for private or proprietary function,[11] and it has sometimes been held that the operation of sewer and water works systems is a

---

8. 73–14–2(c), U.C.A.1953 (Supp.1955).

9. 73–14–2(e), U.C.A.1953 (Supp.1955).

10. See Article, 5 Utah Law Rev. 233 (1956) by David E. West.

11. See e. g. City of Panhandle v. Byrd, Tex.Civ.App., 77 S.W.2d 904, 910; 62 C.J.S., Municipal Corporations § 110.

proprietary rather than a governmental activity and the city is liable for negligence in such operations.[12]

■ Where this distinction has been made the basis for interpreting constitutional provisions similar to our own,[13] the cases lack uniformity in its application. Some have held that the constitutional provision safeguards the City's action insofar as the function is proprietary,[14] but in others it is persuasively argued that if such distinction is to be made at all it should have just the opposite effect: That is, that it would be more logical that the framers intended the cities to have freedom in their governmental activities.[15] The lack of any consistency of results reached in applying the tort liability cases to the instant problem makes plain that the tests there employed [16] have no particular relevancy on the question here involved as to whether a special commission can supervise "municipal" activities of the City. We can see no reason why the framers of the Constitution would have intended to decree that no special commission could supervise the City with respect to any proprietary activity, such as a public bathhouse, but have intended that it might be subjected to supervision with respect to its more important functions of a governmental nature such as the operation of a fire department.[17] It is to be kept in mind that the very purpose of Section 29, Article VI, hereinabove quoted, prohibiting the delegation of powers of supervision to any "special commission" over cities was to insure, insofar as practicable, the powers to cities and towns to manage their own internal affairs, as previously articulated by this court, "To hold inviolate the right of local self-government * * * with respect to municipal improvements." [18]

12. Egelhoff v. Ogden City, 71 Utah 511, 267 P. 1011; Brown v. Salt Lake City, 33 Utah 222, 93 P. 570, 14 L.R.A.,N.S., 619; Kiesel v. Ogden City, 8 Utah 237, 30 P. 758.

13. The following states have constitutional provisions similar to our own: Colorado, Art. V, § 35; Montana, Art. V, § 36; Pennsylvania, Art. III, § 20, P.S. South Dakota, Art. III, § 26; California, Art. XI, § 13; Wyoming, Art. III, § 37. See Stewart v. City of Cheyenne, 60 Wyo. 497, 154 P.2d 355.

14. See e. g. State ex rel. Brooks v. Cook, 84 Mont. 478, 276 P. 958. We are not unmindful that in Salt Lake County v. Salt Lake City, 42 Utah 548, 134 P. 560, there is language which suggests that the municipal-proprietary distinction might be used as a basis for gauging the meaning of this constitutional provision.

15. See Lighton v. Abington Tp., 336 Pa. 345, 9 A.2d 609 (dissenting opinion).

16. These tests generally are whether the activity is for the public good, whether there is a special benefit to the city, or whether there is competition with free enterprise. See Ramirez v. Ogden City, 34 Utah 2d 102, 279 P.2d 463, 47 A.L.R. 2d 539.

17. Rollow v. Ogden City, 66 Utah 475, 243 P. 791 (held to be a governmental activity).

18. Logan City v. Public Utilities Commission, 72 Utah 536, 271 P. 961, 972. See also Union Pac. R. Co. v. Public Service Commission, 103 Utah 186, 134 P.2d 469.

254

■ If the constitutional provision was intended to assure the City freedom from outside supervision and control, it most certainly seems that it must be with respect to their primary and essential functions. Considering this purpose, it does not seem open to question that in the context of the constitutional provision here under consideration the term "municipal" as used in connection with municipal improvement and municipal function, was used in its broad sense and would include any activity properly engaged in by the city or municipality, whether governmental or proprietary. Sewage disposal is a function which is almost invariably left to cities to perform, and our statutes specifically grant them the power to "construct, reconstruct, maintain and operate, sewer systems, sewage treatment plants, culverts, drains, sewers, catch basins, manholes, cesspools and all systems, equipment and facilities necessary to the proper drainage, sewage and sanitary sewage disposal requirements of the city or town and regulate the construction and use thereof." [19] It is therefore so patent as to hardly require demonstration that the maintenance of a sewerage disposal system is a proper function of the city.

This conclusion is supported by the reasoning of the Pennsylvania court in Lighton v. Abington,[20] whose language we quote with approval:

"It has been suggested that, while the conclusion reached would be correct if the operation of the sewerage system were a governmental instead of a proprietary activity, Article III, section 20, [Pa.Const.] does not apply because a proprietary function is under consideration. But the constitution makes no such distinction; the words are plain and must be given their common or popular meaning, for in that sense, the voters are assumed to have understood them when they adopted the constitution: * * *. The section prohibits delegating to any private corporation 'any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.' There are no words, on the one hand, restricting the prohibition to property, etc., used for purely governmental purposes and, on the other, allowing the delegation for property etc. employed in proprietary capacities. Both classes of municipal activity were familiar when the constitution was adopted. The sewerage system is a municipal improvement; it is property belonging

19. 10–8–38, U.C.A.1953.

20. 336 Pa. 345, 9 A.2d 609, 613.

to the municipality; in whatever capacity used, whether governmental or proprietary, the words of section 20 expressly include it; we must give them effect."

 It is to be noted that we are here dealing specifically with respect to the problem of sewerage disposal within Salt Lake City, and as affecting the inhabitants thereof. It is obvious that a community might so handle its sewage as to constitute a menace to the health of other communities or inhabitants of the state, e. g. by letting it escape into streams, or lakes or springs which form their head waters so that it would affect lower users. This is undoubtedly the reason for the general language in the statute granting the Water Pollution Board its powers to guard against pollution of "all * * * bodies * * * of water, * * * contained within * * * this state * * *." If the statute is so construed, the Board is endowed with authority to supervise and regulate such matters where they are conducted in a manner which threatens pollution of waters beyond the confines of the city. Such interpretation does not run afoul the constitutional provision hereinabove discussed relating to the City's independence of internal operation and is in accord with the well-established rule of constitutional law that where there are two alternatives as to the interpretation of a statute, one of which would make its constitutionality doubtful, and the other would render it constitutional, the latter will prevail.[21]

██ It is finally pointed out by the Board that the constitutional provision only prohibits the legislature from delegating the powers involved to a "special commission, private corporation or association." It is contended that the Water Pollution Board is not a "special Commission" within the meaning of the Constitution. With this we do not agree. The same question was raised in the case of Logan City v. Public Utilities Commission,[22] wherein it was held that the defendant was a "special commission" and in specifically rejecting a Montana case holding to the contrary stated:

"But we think such a construction * * * is too narrow, and one which in effect impairs the very essence and purpose of it, deprives cities and towns of local self-government, and interferes with * * * their municipal corporate affairs with respect to their improvements, property and municipal functions."

It appears that the only cases in which this court has found the Constitution inapplicable to the interfering agency are those similar to the case of Lehi City v.

21. Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400.

22. 72 Utah 536, 271 P. 961.

256

Meiling,[23] wherein it was held that a Metropolitan Water District was not a "special commission." However, that the similar cases, are clearly distinguishable in that the Metropolitan Water District was initiated by the cities desiring the district and there was no direct delegation by the legislature to a board or agency which would allow it to interfere with any municipal improvement, property, or function.

The decision of the trial court is affirmed. Costs to respondent.

McDONOUGH, C. J., and WADE, WORTHEN and HENRIOD, JJ., concur.

23. 87 Utah 237, 48 P.2d 530. See also Tygesen v. Magna Water Co., 119 Utah 274, 226 P.2d 127.