504 P.2d 1007

**I. J. WAGNER et al., Plaintiffs and Appellants,**

**v.**

**SALT LAKE CITY, a municipal corporation, Defendant and Respondent.**

No. 12618.

Supreme Court of Utah.

Dec. 20, 1972.

---

1. Smith v. Brown, 27 Utah 2d 155, 493 P.2d 994 (1972); Peterson v. Fowler, 27 Utah 2d 159, 493 P.2d 997 (1972).

**44**

Callister, Kesler & Callister, Louis H. Callister, Jr., Jones, Waldo, Holbrook & McDonough, H. R. Waldo, Salt Lake City, for plaintiffs and appellants.

John Preston Creer, Salt Lake City, for defendant and respondent.

CROFT, District Judge:

This case involves an appeal from a summary judgment granted in the District Court whereby that court upheld the constitutionality of The Burying of Overhead Utilities Act enacted into law in 1961 [1] and denied appellants the injunctive relief prayed for in their complaint. We affirm.

On February 3, 1971, respondent Salt Lake City, through its Board of Commissioners, established Underground Conversion of Utilities District No. 8–F–1A comprising all of Lots 14 to 19, inclusive, of Plat C, North Hills Subdivision, doing so pursuant to said Act and the provisions of the Revised Ordinances of Salt Lake City.[2] The appellants Wagner own property entirely within the said utility district and the appellants Wright own property located entirely outside of that district, but adjacent to it.

1. Title 54, Chapter 8, U.C.A. 1953 as amended; Ch. 157, L of Utah, 1969.

2. Title 39, Ch. 7, Revised Ordinances of Salt Lake City, 1965, effective November 18, 1970.

The appellants thereafter filed a Declaratory Judgment action by which they sought a judgment declaring said act and city ordinance unconstitutional and enjoining respondent from undertaking any further proceedings in connection with District No. 8–F–1A. Respondent filed its answer denying the act and ordinance were unconstitutional. A stipulation of agreed facts was filed by the parties and both sides moved for summary judgment. The trial court ruled in favor of respondent.

The utility district in question was established for the purpose of removing overhead electric and telephone wires within the district and replacing them with underground facilities to serve each of the six lots within the district. Appellants do not contend that in establishing the utility district the board of commissioners failed to follow the statutes and ordinances,[3] but rather assert that they are unconstitutional for the following stated reasons:

(1) They authorize public action and taxation for private purposes.

(2) They authorize a lending of public credit for private purposes.

(3) They constitute an unlawful delegation of municipal functions to private corporations.

(4) They violate the debt limit and election provisions of the Constitution of Utah.

(5) They unconstitutionally deny due process of law.

(6) The method of assessment authorized therein constitutes a denial of due process and the equal protection of the laws.

(7) They permit the taking of property without just compensation.

The first three contentions may be considered together, for appellants contend that the placing of power and telephone lines underground benefits only the private property owners and the utility companies involved and does not serve a public purpose. In support they assert that the legislation in question thereby violates the constitutional prohibitions against a legislative delegation of power to a private corporation to levy taxes, to perform municipal functions,[4] or to authorize any city to lend its credit in aid of any private individual or corporate enterprise.[5]

---

3. The statutes and ordinances are substantially identical and are jointly referred to in this opinion as the "legislation in question."

4. Article VI, Sec. 29 of the Constitution of Utah provides: "The legislature shall not delegate to any . . . private corporation . . . any power . . . to levy taxes . . . or to perform any municipal functions.

5. Article VI, Sec. 31 of the Constitution provides: "The Legislature shall not authorize . . . any . . . city . . . to lend its credit . . . in aid of any . . . private individual or corporate enterprise or undertaking."

We believe the appellants are in error in assuming that no public purpose is served by burying power and telephone lines underground. The legislature in enacting the Act in question finds it to be in the public interest to convert existing overhead electric and communication facilities to underground locations and declares that a public purpose will be served by providing a procedure for accomplishing such conversion by proceedings taken pursuant to the act.[6] The public body seeking to create an improvement district to effect the purpose intended must determine that such "will promote the public convenience, necessity, and welfare."[7]

In McQuillan on Municipal Corporations it is stated:

What is a municipal purpose is not susceptible of precise definition. While the question of what is and what is not a public purpose is initially a legislative responsibility to determine, in its final analysis, it is for the courts to answer.[8]

 It is not to be assumed that a "private purpose" can be made a "public purpose" merely by legislative fiat. But as times change, so may the nature of "purposes" change. Furthermore, as McQuillan says:

If the primary object is to subserve a public municipal purpose, it is immaterial that, incidentally, private ends may be advanced. Moreover, the public purposes for which cities may incur liabilities are not restricted to those for which precedent can be found, but the test is whether the work is required for the general good of all the inhabitants of the city.[9]

In 56 Am.Jur.2d, Sec. 230, Municipal Corporations, page 290, it is stated:

A public purpose or use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication . . . The modern trend of decision is to expand and liberally construe the term "public use" in considering state and municipal activities sought to be brought within its meaning. . . .

The determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the legislative body's determination of that matter should not be reversed except in instances where such determination is palpably and manifestly arbitrary and incorrect.

 In today's society where power and telephone lines must reach into every

6. Sec. 54–8–2, U.C.A. 1953 as amended.
7. Sec. 54–8–6.
8. Sec. 39.13, Vol. 15, pg. 37.
9. Id. (6) pg. 36.
 No. 12618.

home; where population is concentrating in metropolitan areas; where big machinery and far-reaching equipment must be used and moved; where moving vehicles frequently strike power poles; where storms may damage power lines and endanger the public; where lightning may strike power equipment and leave large areas without power; where trees must be repeatedly trimmed away from power lines; and where children may be endangered by their proximity and availability; we do not find the legislative determination that conversion of such utilities from overhead to underground locations serves a public purpose is "palpably and manifestly arbitrary and incorrect."

In support of their contention that the legislation in question constitutes an unlawful delegation of municipal functions to private corporations, appellants assert that such unlawful delegation is to be found in the fact that since the utility companies fix the costs and determine feasibility of the installation and then do the work, they thereby perform the municipal function of levying taxes and lending the public credit. But an examination of the statutes shows clearly that such is not the case.

The feasibility study and cost estimate follows the filing of a petition for the creation of an improvement district by the property owners involved and the passage of a resolution by the governing body of the city.[10] After the filing of such study or report, the governing body, after consideration of it, must pass a resolution declaring its intent to create the improvement district,[11] following which notice is given of a public hearing in which the estimated costs (among other things) are published and a hearing held thereon.[12] After consideration of argument submitted at the public hearing, the governing body again proposes a resolution for adoption at another public hearing which resolution must declare all costs involved and contain a proposed assessment list.[13] The governing body also appoints three of its members as a board of equalization and review to conduct the required hearing on that resolution.[14] Such board then makes a report to the governing body after the hearing and the latter must then pass upon the adoption of the assessment resolution.[15]

The wisdom of determining the feasibility of making the improvements and their costs at the outset is self-evident. The highly technical nature of the utilities involved, the potential danger if not properly installed and the need for expertise from the beginning is readily apparent. There is legislative recognition that the utility companies have such expertise.[16]

10. Sec. 54–8–6.
11. Sec. 54–8–8.
12. Sec. 54–8–9.
13. Sec. 54–8–14.
14. Sec. 54–8–15.
15. Sec. 54–8–18.
16. Sec. 54–8–7.

How the legislature could have provided for a more profound involvement of the governing body between the feasibility study and cost estimate and the final assessment resolution and bond issuance is difficult to imagine. The proceedings required of the governing body in the challenged legislation manifestly demonstrate that in obtaining the feasibility study and cost estimate from the utility companies, the governing body is not delegating its municipal function of levying taxes or lending its credit.

Clearly any taxes assessed are fixed and assessed by the municipality. In State Road Commission v. Utah Power & Light [17] this court held that legislation authorizing use of public funds to pay the cost of relocating utility facilities in construction of public roads was not unconstitutional as being a lending of public credit in aid of private business.

In Allen v. Tooele County [18] this court said:

The County could be deemed to "lend its credit" to the enterprise only if the

County might in some eventuality be required to pay the obligation.

Under the Act in question the legislature provided that bonds issued to meet the costs of the conversion could be issued in a principal amount not exceeding the unpaid balance of the assessments levied; that those bonds "shall be secured by and payable from the irrevocable pledge and dedication of the funds derived from the levy and collection of the special assessments in anticipation of the collection of which they are issued;" [19] and that upon default the governing body may proceed against the property to collect the whole of the remaining assessment obligation.[20]

Appellants contend that under such legislation, there is nothing contained therein that limits the bondholder to the assessment monies as the sole source of payment and conclude therefrom that the general credit of the governing entity may be obligated to pay such bonds. They assert that the legislature should have, as it did in the Municipal Improvement District Act,[21] specifically provided that such bonds were not a general obligation of the municipality and that the municipality should not be held liable except to the extent of the amount of the unpaid assessments. The fact that the legislature may have been more specific in its wording of a statute does not render it unconstitutional. In providing that the bonds "shall be secured by and payable from" the funds derived from the special assessment the legislature gave us a statute that can reasonably be

17. 10 Utah 2d 333, 353 P.2d 171.
18. 21 Utah 2d 383, 445 P.2d 994.

19. Sec. 54–8–22.
20. Sec. 54–8–20.
21. Sec. 10–16–29.

interpreted as being mandatory in such direction. It is a well-established rule of constitutional law that where there are two alternatives as to the interpretation of a statute, one of which would make its constitutionality doubtful and the other would render it constitutional, the latter will prevail.[22]

■ Thus, in the legislation in question we see no unconstitutional delegation to a private corporation of a municipal function to either levy taxes or to lend the credit of the municipality for a private purpose.

■ Appellants' contention that the legislation in question unconstitutionally violates the debt limit and election provisions of the Constitution of Utah[23] is based upon the assertion that the Act contains nothing that limits the bondholder to the assessment monies as the sole source of payment, nor is the issuer of the bonds prohibited from obligating the full faith and credit of the municipality. The issuer of the bonds is the governing body of the city.[24] As already noted,[25] the statute expressly provides the bonds shall be secured by and payable from the irrevocable pledge and dedication of the funds derived from the special assessment.

In Pearson v. Salt Lake County,[26] this court said "Everyone agrees that a special improvement tax levied only as a lien against the adjoining real property is not a county debt." We hold that the special assessment authorized by the legislation in question is not a debt in the constitutional sense. It must be assumed that in the issuance of bonds under the Act, the governing body of the city will comply with the statutory provisions relating to the source of payment of such bonds.

Appellants' contentions that the legislation in question constitute a denial of due process and equal protection which merit consideration may be summarized as follows: (1) That the Act has no provision fixing a period of time prior to the first hearing when notice of such hearing must be given;[27] (2) that the square footage

22. State Water Pollution Control Board v. Salt Lake City, 6 Utah 2d 247, 311 P.2d 370.

23. Art. XIV, Sec. 3 of the Constitution of Utah provides: "No debt in excess of the taxes for the current year shall be created by . . . any city . . . unless the proposition to create such debt, shall have been submitted to a vote of . . . qualified electors . . . ."

24. Sec. 58–8–22.

25. See note 19, supra.

26. 9 Utah 2d 388, 346 P.2d 155.

27. Sec. 54–8–10 provides only that notice of the hearing shall be published one time in a newspaper of general circulation and by posting in not less than three public places. Copies of the notice are also to be sent by certified mail to each owner of the land to be included in the district to be assessed at the last known address of such owner and also to the "owner" to the street number of each parcel of improved property to be included. This statute does not fix a period of time prior to such hearing for which such notice shall be given as is done in Sec. 54–8–16 for the assessment hearing.

**50**

formula[28] for fixing assessments is not equitable; (3) failure to recognize benefits to the utility companies and assessing part of the costs to those companies denies equal protection to the property owners who will be assessed. Other contentions such as that the hearings provided for are "empty formalities;" that the hearings are "merely perfunctory" and too much dependent on actions of the utility companies; and that costs are not minimized and there is no real opportunity for the governing body or property owners to inquire into costs, we deem to be without merit for clearly the legislation does not so provide.

■■ This court has said that it is axiomatic that the order of an administrative body issued without notice to affected individuals is violative of due process.[29] Undoubtedly, it would have been better had the legislature fixed a reasonable time, as it did in Section 54-8-16 for the second hearing, for giving notice prior to the hearing. But the legislation does not, of itself, prohibit or deny reasonable notice and the inference is found in the requirements for how notice is to be given that it will be given in sufficient time to afford those affected an opportunity to be present. If reasonable notice is not given, it may affect the validity of the hearing, but the fact that reasonable notice may not

be given administratively does not render the statute unconstitutional.

■ Assessments of costs are not to be based solely upon square footage. The statutes require that the notice of the first hearing shall state that it is proposed to assess the cost according to the square footage "and the benefits to be derived by each tract"; [30] that the board of equalization and review shall have authority to make changes or corrections in the proposed assessments and must find that each piece of property will be benefited in amounts not less than the assessment to be levied; [31] that the governing body shall, after the hearing, make such corrections in the assessment list as may be just and equitable and shall make a specific finding that no proposed assessment exceeds the benefit to be derived from the improvement by each piece of property; and that no piece shall bear more than its proper proportionate share of the cost.[32] Such safeguards render the assessment formula to be used constitutionally sound.

■ As to appellants' contention that the legislation is constitutionally deficient in failing to recognize the benefit to the companies and requiring them to pay a part of the costs, it is to be noted that costs upon which assessments are to be made are fixed only after hearings there-

28. Sec. 54-8-5.
29. Morris v. Public Service Commission, 7 Utah 2d 167, 321 P.2d 644.

30. Sec. 54-8-9.
31. Sec. 54-8-15.
32. Sec. 54-8-32.

on, and that payment is to be based upon the actual cost of construction of the underground facility rather than the estimated cost.[33] The claim that utility companies will find a financial benefit in the conversion is speculative. In State Road Commission v. Utah Power and Light Company[34] this court determined that the legislature had the power to relieve the utilities of the obligation to pay the cost of relocating utility facilities and to impose that cost on the state in connection with the interstate highway program. In that case it was recognized that the utility companies should be protected against suffering a net loss in the relocation of their facilities resulting from the "vast and far-flung highway building program." Placing power and telephone utilities underground in the communities of this state will be no small project, and requiring the utility companies to bear the cost of speculative benefits may well be prohibitive, or result in a substantial increase in rates.

We find no violation of either the due process clause[35] or the equal protection clause[36] of our constitution in the procedures provided for in the legislation in question.

■ Finally, appellants contend that the legislation in question permits and even

requires the taking of property without just compensation, contrary to the Constitution of Utah,[37] in two respects. First is the claim that the underground conversion, in effect, creates a new easement, interfering with surface use. But surface use is not the controlling factor. If existing easements are insufficient to provide for the placement of distribution lines underground, or if technical considerations make it reasonably necessary to utilize easements different from the existing easement for above ground facilities, then the costs of obtaining such new easements are to be included in the conversion costs upon which assessments are to be based.[38] It follows that a grantor of such new easement is to be compensated for it and the legislation does not otherwise provide. The fact that a grantor of such new easement may, as an owner, be assessed for a part of such cost to be paid to himself as the grantor does not render it a taking without just compensation. Any taxpayer whose land is taken for a public purpose contributes as a taxpayer to the compensation paid to him for that land.

■ Secondly, appellants claim an easement is taken when service lines running from distribution lines to his house are placed underground for which he is en-

33. Sec. 54–8–27.

34. Supra—note 17.

35. Art. I—Sec. 7, Constitution of Utah.

36. Art. I—Sec. 2, Constitution of Utah.

37. Article I, Sec. 22, Constitution of Utah provides: "Private property shall not be taken or damaged for public use without just compensation."

38. Sec. 54–8–24.

**52**

titled to compensation. But such is not the case. The service line is installed for the benefit of the owner. The only way an owner can get the service he desires and needs is to run the service line across his property to his house. Each owner need pay only for the cost of its installation on his own property and the statute permits him to do some of the work himself and avoid part of the cost.[39] It is to be remembered that the creation of such improvement districts by a governing body is based upon petitions for such improvements signed by two-thirds of the property owners within the district.[40] The utility companies are neither the instigators nor necessarily the beneficiaries of making such changes. There is a difference between distribution lines that service all the properties and service lines that serve only an owner's property. All owners are to share in the cost of distribution line easements. Each is to pay the cost of converting underground his own service line.[41] Such requirement is not a constitutional taking for which just compensation must be paid.

Judgment affirmed.

TUCKETT, HENRIOD, ELLETT and CROCKETT, JJ., concur.

CALLISTER, C. J., having disqualified himself, does not participate herein.

39. Sec. 54–8–26.
40. Sec. 54–8–6.