**UTAH TECHNOLOGY FINANCE CORPORATION, Plaintiff and Respondent,**

v.

**David L. WILKINSON, Attorney General of Utah, Defendant and Appellant.**

**David L. WILKINSON, Attorney General for the State of Utah, and Edward T. Alter, State Treasurer for the State of Utah, Plaintiffs and Appellants,**

v.

**UTAH TECHNOLOGY FINANCE CORPORATION, and its Board of Trustees, namely Sydney J. Green, Eugene Overfelt, Willard H. Gardiner, James S. Jardine, Warren E. Pugh, Robert H. Garff, and Karl N. Snow, Jr., and John Does I–X, Defendants and Respondents.**

No. 860097.

Supreme Court of Utah.

July 31, 1986.

David L. Wilkinson, Atty. Gen., Ralph L. Finlayson, Stephen J. Sorenson, Salt Lake City, for defendant and appellant.

Alan L. Sullivan, Patrick J. O'Hara, Salt Lake City, for plaintiff and respondent.

HOWE, Justice:

The Attorney General and the State Treasurer, and Utah Technology Finance Corporation filed suits against each other in district court to determine the constitutionality of the Utah Technology and Innovation Act (the Act) U.C.A., 1953, §§ 63–60–1, *et seq.* The district court consolidated the cases and, on cross-motions for summary judgment, held that the Act did not violate article VI, section 29 of the Utah Constitution and that Utah Technology Finance Corp. (UTFC), created by the Act, was not prohibited from hiring private counsel.[1] The Attorney General brings this appeal.

The Act was passed by the legislature in 1983 and bestowed upon UTFC the power "to take all action necessary or desirable to encourage and assist in the research, development, promotion and growth of emerging and developing technological and innovative small businesses throughout Utah." The Act specifically authorized UTFC to provide capital for equity investment or to make direct loans to assist and encourage emerging and developing small businesses.

In 1985, section 63–60–3 of the Act was amended to include the following legislative findings: The development of high technology was necessary to insure progress. Small emerging businesses have a substantially greater rate of innovation and development in high technology and create new employment at a greater rate than mature businesses. Fostering the development of high technology in this state "is necessary to assure the welfare of its citizens, the growth of its economy, adequate employment for its citizens and progress." This was to be accomplished by UTFC through "assisting and participating in the organization, capital formation, management, growth, development, and disposition of small and emerging businesses...."

UTFC, in endeavoring to aid developing small high-tech businesses, agreed to commit $1 million of public funds appropriated to it to secure a limited partnership interest in Venture Fund I, a private, for-profit limited partnership. Venture Fund I proposes to use that amount, as well as private capital, to subscribe to stock providing selected small high-tech businesses with startup capital. Questions of the constitutionality of the use of public funds to aid private businesses spawned the litigation that has brought the parties before this Court.

## I.

The first issue is whether the Act violates the provisions of article VI, section 29 of the Utah Constitution,[2] which provides:

1. Other issues were argued and ruled on at trial; however, for the purposes of this expedited appeal only these two issues have been briefed.

2. This section was originally article VI, section 31. In 1972, the Constitution was amended, deleting sections of article VI and renumbering section 31 as article VI, section 29. *See* S.J.Res.

The Legislature shall not authorize the State, or any county, city, town, township, district or other political subdivision of the State to lend its credit or subscribe to stock or bonds in aid of any railroad, telegraph or other private individual or corporate enterprise or undertaking.

The district court in its memorandum decision stated that the purpose of section 29 was to "insure that public funds are spent for public purposes." The court then found that the "public purposes" of the Act as stated by the legislature had a "rational basis," and therefore the Act was constitutional.

Section 29 contains two interdictions on the power of the legislature to authorize aid to private enterprise: the lending of credit and the subscription to stock or bonds. Since the legislature has every power which has not been granted to the federal government or prohibited by the state constitution, *State v. Mason*, 94 Utah 501, 78 P.2d 920, 117 A.L.R. 330 (1938), the legislature is not restrained from authorizing assistance in other ways. We shall discuss the two prohibitions separately.

### A. Lending of Credit

■ In the ninety years which have passed since the adoption of the Utah Constitution, thirteen cases have been appealed to this Court in which it was contended that section 29 had been violated. In all of them, the specific assertion was made that there was a lending of credit in aid of private enterprise. In the first seven cases decided, this Court, with little or no mention of what actually constitutes the lending of credit, concluded that there was no direct aid to private enterprise; instead, a public purpose was served, and hence there was no unconstitutional lending of credit. *Bailey v. Van Dyke*, 66 Utah 184, 240 P. 454 (1925) (agricultural extension work); *Lehi City v. Meiling*, 87 Utah 237, 48 P.2d

530 (1935) (creation of metropolitan water districts); *Wallberg v. Utah Public Welfare Commission*, 115 Utah 242, 203 P.2d 935 (1949) (payment of old age assistance in exchange of a pledge by the recipient of his real property as a guarantee for reimbursement); *Barlow v. Clearfield City Corp.*, 1 Utah 2d 419, 268 P.2d 682 (1954) (contract to purchase culinary water for city); *Bair v. Layton City Corp.*, 6 Utah 2d 138, 307 P.2d 895 (1957) (contract for the disposal and treatment of city's sewage); *State Road Commission of Utah v. Utah Power & Light Co.*, 10 Utah 2d 333, 353 P.2d 171 (1960) (relocation of underground utility lines in public highways); *Utah State Land Board v. Utah State Finance Commission*, 12 Utah 2d 265, 365 P.2d 213 (1961) (purchase by state agency of well-established corporate securities in the investment of public funds).

Only in the last six cases did we hold that there was no actual lending of credit. *Allen v. Tooele County*, 21 Utah 2d 383, 445 P.2d 994 (1968) (issuance of industrial development revenue bonds by a county); *Wagner v. Salt Lake City*, 29 Utah 2d 42, 504 P.2d 1007 (1972) (issuance of revenue bonds by a municipal improvement district for the purpose of removing overhead electrical and telephone wires and replacing them with underground facilities); *Tribe v. Salt Lake City Corp.*, 540 P.2d 499 (Utah 1975) (issuance of revenue bonds by redevelopment agency); *Utah Housing Finance Agency v. Smart*, 561 P.2d 1052 (Utah 1977) (issuance by state agency of revenue bonds to provide mortgage money to low—and moderate—income persons); *Salt Lake County v. Murray City Redevelopment*, 598 P.2d 1339 (Utah 1979) (issuance of revenue bonds by a redevelopment agency); *Municipal Building Authority of Iron County v. Lowder*, 711 P.2d 273 (Utah 1985) (issuance of revenue bonds by a county building authority).

1, 1972 Utah Laws (approved at the general election November 7, 1972).

In 1974, S.J.Res. 3, 1974 Utah Laws 234, proposed that section 29 be amended to read, "[T]he legislature shall not authorize the state, or any political subdivision of the state to lend its credit except to aid in the establishment or expansion of private industry, within the state." This proposed amendment, which would have eliminated the issue raised in this case, was rejected by the voters of the state 240,813 against the change to 129,833 in favor.

These cases all involved the issuance of revenue bonds, and we reasoned that because they were payable only out of the revenues of the project and the bonds were not an indebtedness of the state or one of its subdivisions, there was in fact no lending of its credit. In the first of these six cases, *Allen v. Tooele County, supra,* we, for the first time, made a partial definitive statement of what constitutes the lending of credit. There, we said that Tooele County could be deemed to "lend its credit" to the private enterprise only if "the county might in some eventuality be required to pay the obligation [of the private enterprise]." This definition was based on statements made by two delegates to our State Constitutional Convention. The first statement was made by delegate David Evans and is found in the Proceedings of the Constitutional Convention, volume 1, page 953. He said:

> What is loaning the credit of a State or county or municipality? In short, it means that any corporation or enterprise, desiring to start a business, and for the purpose of aiding it, the State endorses or rather guarantees the bond or paper of such individual or corporation. . . .

The second statement relied upon was made by delegate Samuel R. Thurman, found at page 979 of the same volume. There, he said: "It is not a question of the State being permitted to make a donation or give bonuses from time to time . . . , but it is a question of mortgaging the State, not for the payment of its own debt but for the payment of the debt of another."

Many other state constitutions contain a prohibition against the lending of credit. Some also interdict the "giving" of credit and various other means of assistance. An in-depth analysis of what constitutes the lending of credit was made by the Court of Appeals of Maryland in *Johns Hopkins University v. Williams,* 199 Md. 382, 86 A.2d 892 (1952). Since 1851, the Constitution of Maryland has provided that "the credit of the state shall not in any manner be given, or loaned to, or in aid of any individual, association or corporation." The court in its opinion observed that that provision was exactly the same as a clause inserted in the Constitution of the State of New York in 1846. The court quoted the following statement made by a Mr. Albord, a member of the constitutional convention of New York of 1867. He said:

> The past history of this state previous to the constitution of 1846 was this: if a railroad or some enterprise of that kind was started in any portion of the State, and was unable as it seemed to get along without some State aid the State came in as an indorser or security for the road, loaning to the road or to the corporation its bonds, payable at a future period of time, with an agreement on the part of the corporation to take care of the interest as it became due and ultimately to redeem the principal. The result was in very many instances the State lost the entire amount of the investment.

Governor Wright of New York in 1845 reported that more than three-fifths of the debt chargeable on the general fund had been incurred by loans of the state's credit to railroad corporations which subsequently failed. Therefore, in 1846 the credit of the state of New York which had been loaned to private railroads and canal companies had been drastically impaired. It was for that purpose that the constitutional provision against the lending of credit was adopted.

The Maryland court cited and discussed cases from many states with similar constitutional provisions and approved and adopted a statement made in *Grout v. Kendall,* 195 Iowa 467, 192 N.W. 529 (1923). Iowa, like Maryland, had taken its credit clause from the New York Constitution. The Iowa court, in construing that clause in a veteran's bonus case, said:

> What is meant herein by a loan of *credit?* When one signs an accommodation note and delivers it to his neighbor, he loans his credit to his neighbor. He has not created a debt to him. The neighbor is authorized to use the credit with third parties; but he is also under obligation to the maker to protect him against liability and ultimately to return the note. When

one becomes surety for his neighbor and signs his promissory notes to third parties, he loans his credit.... The liability of the surety is always secondary, and not primary. It is a liability for the debt of another, which such other is bound to pay. And herein is the delusion of suretyship. The surety assumes a secondary liability in the optimistic assurance and belief always that the primary debtor will pay, and that he will never be required to perform the obligation.... It was to remove this delusion of suretyship, with its snare of temptation, that this section of the Constitution was adopted. It withheld from constituted authorities of the state *all power or function of suretyship*. It forbade the incurring of obligations by the indirect method of secondary liability. This is the field and the full scope of this section. It does not purport to deal with the creation of a primary indebtedness for any purpose whatever.

(Emphasis in original.)

The Maryland court found additional support for its position in cases from Illinois, Arkansas, and Washington. *Hagler v. Small*, 307 Ill. 460, 138 N.E. 849 (1923); *Bush v. Martineau*, 174 Ark. 214, 295 S.W. 9 (1927); *Gruen v. State Tax Commission*, 35 Wash.2d 1, 211 P.2d 651 (1949).

The interpretation given to Maryland's "lending of credit" clause in *Johns Hopkins University v. Williams, supra, viz.*, that it forbids the state from becoming a surety or guarantor of an obligation of another, has been followed in two Illinois decisions. In the first, *Fairbank v. Stratton*, 14 Ill.2d 307, 152 N.E.2d 569 (1958), the Supreme Court of Illinois held that the state treasurer could lawfully purchase revenue bonds issued by the metropolitan fair and exposition authority. Said the court:

The transaction in question involves only a purchase or loan. There is a loan of state funds, not of State credit. The State is not undertaking to become a surety or guarantor of payment of the bonds. It would be in the position of a

creditor, rather than that of a debtor which arises upon a loan of credit. We conclude that the provisions of section 20 of article IV of the constitution [forbidding the state from giving, loaning, or extending its credit] have no application with respect to the contemplated purchase.

The second case, *Continental Illinois National Bank & Trust Co. of Chicago v. Illinois State Toll Highway Commission*, 42 Ill.2d 385, 251 N.E.2d 253 (1969), is in accord. Idaho has similarly construed the credit clause of its constitution. In *Engelking v. Investment Board*, 93 Idaho 217, 458 P.2d 213 (1969), it was held that the loaning of state funds was not the same as the loaning of the state's credit. The court remarked:

The word "credit" as used in this provision implies the imposition of some new financial liability upon the State which in effect results in the creation of State debt for the benefit of private enterprises. This was the evil intended to be remedied by Idaho Const. art. 8, § 2 and similar provisions in other state constitutions [citing cases]. Yet that particular evil is not presented by the investment of existing funds of the State, for no new State debts are created by such action.

The later Idaho case of *Nelson v. Marshall*, 94 Idaho 726, 497 P.2d 47 (1972), is in accord.

Kentucky takes the same view in construing section 177 of the constitution of that state, which provides that "the credit of the commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association, municipality, or political subdivision of the state; ...." In *Industrial Development Authority v. Eastern Kentucky Regional Planning Commission*, 332 S.W.2d 274 (Ky.1960), it was contended that the investment of state funds in an industrial project would constitute a lending of credit. The court rejected that contention, stating that a loan of state funds is not a loan of the state's credit, citing *Fairbank v. Stratton, supra*. This holding was followed in the later case of

*Stovall v. Eastern Baptist Institute,* 375 S.W.2d 273 (Ky.1964). Two Wisconsin cases followed the Maryland interpretation of lending of credit. In *State ex rel. Wisconsin Development Authority v. Dammann,* 228 Wis. 197, 280 N.W. 698 (1938) (on rehearing), the court held that the giving or loaning of the credit of the state occurs only when such giving or loaning results in the creation by the state of a legally enforceable obligation on its part to pay to one party an obligation incurred or to be incurred in favor of that party by another party. More recently, this interpretation was repeated by the same court in *State ex rel. La Follette v. Reuter,* 33 Wis.2d 384, 147 N.W.2d 304 (1967).

Lastly, the lending of credit clause of the Florida Constitution has been interpreted to require the imposition of some new financial liability upon the state or a political subdivision which in effect results in the creation of a state or political subdivision debt for the benefit of private enterprises. *Nohrr v. Brevard County Educational Facilities Authority,* 247 So.2d 304 (Fla. 1971). The Court of Appeals of Tennessee in *Copley v. County of Fentress,* 490 S.W.2d 164 (Tenn.App.1972), adopted the reasoning of the Florida court in *Nohrr* and the Idaho court in *Engelking v. Investment Board, supra.*

Turning now to the instant case, we find nothing in the Act which would authorize a lending of credit as we defined it in *Allen v. Tooele County, supra,* and as defined by other courts in the cases which we have just discussed, *viz.,* the state is not empowered to become a surety or guarantor of another's debts. The Act authorizes UTFC to provide capital for equity investment or to make direct loans to assist and encourage emerging and developing small businesses. In addition, research grants are authorized. These powers are to be exercised with private funds and with funds appropriated to UTFC by the legislature. The Act does not empower UTFC to become a surety or guarantor of the debts of the fledgling businesses it assists. Indeed, the Act does not even permit UTFC to incur any debt of its own. Thus, UTFC cannot become a debtor and in fact would become a creditor if it made a direct loan to an emerging business as provided for in the Act. However, as we have seen, the lending of state funds is not a lending of credit. We hold that the Act does not violate article VI, section 29 of the Utah Constitution insofar as it forbids the lending of the state's credit in aid of a private undertaking.

■ Closely related to the prohibition against the lending of the state's credit, although technically not a part of it due to the narrow and specific wording of section 29, is the principle of law that public funds cannot be expended for private purposes. See notes on the roots of this rule of law in 41 U.Colo.L.Rev. 135, 138 (1968); 59 Colum.L.Rev. 618, 622–23 (1959); and 66 Harv.L.Rev. 898, 900–01 (1953). We have on several occasions paid obeisance to it. *Utah Housing Finance Agency v. Smart, supra; Tribe v. Salt Lake City, supra; Thomas v. Daughters of Utah Pioneers,* 114 Utah 108, 197 P.2d 477 (1948). We find no violation of that principle here. The legislature in rather lengthy findings has determined that the aiding of emerging high-tech businesses will foster the growth of the state's economy and assist in creating employment for the citizens of the state. These findings are entitled to respect and weight by the judiciary and should not be overturned unless palpably erroneous. We recently remarked in *Baker v. Matheson,* 607 P.2d 233 (Utah 1979), "Due respect for the legislative prerogative in law·making requires that the judiciary not interfere with enactments of the Legislature where disagreement is founded only on policy considerations and the legislative scheme employs reasonable means to effectuate a legitimate objective." Again, in *Rio Algom Corp. v. San Juan County,* 681 P.2d 184 (Utah 1984), we stated that "acts of the Legislature are presumed constitutional, especially when dealing with economic matters based on factual assumptions." It is only when a legislative determination of public purpose is so clearly in error as to be capricious and arbitrary that

the judiciary should upset it. *Allen v. Tooele County, supra.*

What is public purpose varies and changes with the times. In 1890, it was held that the purchasing and operating of an electrical distribution system to supply electricity to homes was not a public purpose. *Mauldin v. City Council of Greenville,* 33 S.C. 1, 11 S.E. 434 (1890). In contrast, in the past twelve years we have found public purpose in industrial development by a county, *Allen v. Tooele County, supra;* eradication of urban blight by a quasi-municipal corporation, *Tribe v. Salt Lake City;* and the providing of funds for low- and moderate-income housing by a state agency, *Utah Housing Finance Agency v. Smart, supra.* We cannot say in the face of those precedents that the stimulation of Utah's economy and the creation of employment is not a legitimate public purpose. It is closely related to industrial development and not different in kind. Whatever our private views on the matter might be, we must concede that the legislature's determination that a public benefit would result was within its latitude. The Supreme Court of Connecticut in *Wilson v. Connecticut Product Development Corp.,* 167 Conn. 111, 355 A.2d 72 (1974), upheld legislation similar to the Utah Technology and Innovation Act. The Connecticut Act provided venture capital to create new products and industry, resulting in increased employment and public revenue. It was there contended that the success of any enterprises which might be assisted is speculative and that any ultimate benefits to be realized by the State are remote. The court, however, dismissed those claims, stating that in disputing the business judgment of the legislature the claimants have not demonstrated that the Act does not serve a public purpose. Said the court: "The strong presumption of the act's constitutionality will not be overcome simply because the plaintiff's economic forecasts differ from those of the legislature."

### B. Subscription to Stock

In none of the thirteen cases which have been appealed to this Court involving section 29 has there been a subscription by the state or its political subdivisions to stocks or bonds in aid of any private enterprise. In *Utah State Land Board v. Utah State Finance Commission,* 12 Utah 2d 265, 365 P.2d 213 (1961), the question was presented whether the Utah State Land Board could constitutionally purchase corporate securities in its investment of the public funds which it manages. We held that the Land Board could do so since it would not be *in aid* of any railroad, telegraph, or other private enterprise. The underlying purpose of the investment program was to invest for the benefit of the state, and therefore there was no lending of credit in aid of private enterprise. The prohibition contained in section 29 against subscribing to stock was not specifically mentioned in the Court's opinion. It is clear, however, that there was no subscription of stock since the Land Board was simply purchasing outstanding shares owned by stockholders who desired to sell them on the open market. Clearly, this did not constitute the subscription to stock which section 29 interdicts.

In contrast, the Act before us authorizes UTFC to use funds appropriated to it by the legislature as matching sources of capital for equity investment in emerging and developing technological and innovative small businesses. Accordingly, UTFC has committed $1 million of public funds to purchase a limited partnership interest in Venture Fund I, which proposes to use that amount, together with private funds, to subscribe to stock in selected small high-tech businesses. This is clearly the subscription to stock in aid of private enterprise which section 29 prohibits. UTFC seeks judicial approbation on the ground that the subscription to stock in fledgling businesses has been found by the legislature to have a public purpose. *See* § 63–60–3 of the Act as amended in 1985. However, the legislature's findings of a public purpose are of no avail in this instance. The constitutional convention in promulgating section 29 and its subsequent

adoption by the electorate of this state have foreclosed any speculation or further debate on that issue. Clearly, the subscription to stock in emerging businesses is to aid them. Whether the public benefits thereby is of no consequence. This means of assistance is forbidden by section 29. As observed by Justice Wolfe in his concurring opinion in *Lehi City v. Meiling, supra,* section 29 is directed against "aiding private ventures instituted for private profit but which it thought would indirectly benefit and develop the particular local division loaning its credit." The same can be said for the prohibition against subscribing to stock. The state is foreclosed from subscribing, even though the legislature may determine that public benefits will flow therefrom. The part of the Act which authorizes UTFC to subscribe to stock is unconstitutional and must fail.

▮ The question then arises whether the unconstitutional part of the Act is severable from the remainder of the Act. Recently, in *Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985), we quoted with approval from *Salt Lake City v. International Association of Firefighters,* 563 P.2d 786, 791 (Utah 1977), that "severability, where part of an act is unconstitutional, is primarily a matter of legislative intent." We observed that generally this is determined by whether the remaining portions of the Act can stand alone and serve a legitimate legislative purpose. *See also Smith v. Carbon County,* 95 Utah 340, 81 P.2d 370 (1938). Here, in striking down the authority of UTFC to subscribe to stock in emerging and developing small businesses, the remaining statutory powers conferred on UTFC by the Act are not directly affected. We perceive no reason why UTFC cannot accomplish most, if not all, of the objectives of the Act by the exercise of the other powers and by the other means enumerated in the Act.

## II.

▮ The second issue which is before us is the constitutionality of U.C.A., 1953, § 63-60-4(4)(c), which authorizes UTFC to hire and retain independent legal counsel. The Attorney General contends that provision violates article VII, section 16 of the Constitution of Utah, which provides:

> The Attorney General shall be the legal advisor of the State officers, except as otherwise provided by this Constitution, and shall perform such other duties as provided by law.

We recently had occasion to consider the scope of section 16 in *Hansen v. Utah State Retirement Board,* 652 P.2d 1332 (Utah 1982). In that case, as in the instant case, the attorney general contended that he had exclusive constitutional authority to act as legal advisor to the defendants, who were state agencies, state funds, and trust and insurance funds. We held that section 16 conferred upon the attorney general the authority to act as legal advisor to the constitutional executive officers referred to in article VII, *viz.,* the governor, lieutenant governor, auditor, treasurer, and superintendent of public instruction, "the departments over which they have direct supervisory control, and to the other state executive officers referred to in article VII insofar as the officers of those offices act within the scope of the duties of such office." We gave constitutional sanction to statutes which conferred upon the Utah State Retirement Board and Trust Fund, Industrial Commission and State Insurance Fund, and University of Utah and University of Utah Medical Center authority to employ legal counsel independent of the office of attorney general.

In the instant case, the legislature in section 63-60-4(1) and (2) created UTFC as an independent public nonprofit corporation. Its articles of incorporation are filed with the lieutenant governor, as is true with all other corporations, both profit and nonprofit. It has all power and authority permitted nonprofit corporations by law, including but not limited to those powers stated in the Act. The corporation is governed by a board of trustees of at least seven but not more than eleven trustees appointed for three-year terms by the governor with the consent of the senate. The

corporation is authorized in the Act to hire a full-time director and all other employees which the trustees deem necessary and to establish an advisory board to assist the board of trustees. The state treasurer is made custodian of all funds appropriated to UTFC, as well as any other monies it may acquire. UTFC is required to make an annual report to the governor, and it is subject to annual audit by the state auditor. However, UTFC is not a department over which the executive officers have direct supervisory control as required by *Hansen v. Utah State Retirement Board, supra.* While it is true that UTFC is the recipient of an appropriation of state funds, unlike most of the agencies which were considered in *Hansen v. Utah State Retirement Board, supra,* it is clear that the intent of the legislature was to create it not as a department or agency of the executive department, but as an independent, non-profit, public corporation. Governed as it is by a board of trustees, neither the governor nor any other officer of the executive department enjoys any direct supervisory control over it. Under these circumstances, the legislature did not violate article VII, section 16 in allowing UTFC to hire its own legal counsel.

### III.

The Attorney General further contends that the Act unlawfully delegates legislative authority to UTFC in derogation of article I, section 2; article V, section 1; and article VI, section 1 of the Utah Constitution. We summarily dismiss that contention since we find that the Act does not confer any legislative power on UTFC. Lastly, the Attorney General contends that the Act contravenes article XII, section 1, which provides that "corporations may be formed under general laws but shall not be created by special acts." There is no merit to this contention. In *Utah Farm Bureau Insurance Co. v. Utah Insurance Guaranty Association,* 564 P.2d 751 (Utah 1977), we held that section 1 concerns private corporations and not public corporations created by the legislature to serve public purposes.

The judgment below is affirmed in part and reversed in part in accordance with this opinion. No costs on appeal are awarded.

HALL, C.J., and STEWART, J., concur.

ZIMMERMAN, J., files a concurring opinion.

ZIMMERMAN, Justice (concurring):

I join in the majority opinion. However, that opinion does not expressly address the principal assertion underlying the Attorney General's position—that article VI, section 29 of the Utah Constitution embodies the overarching principle that public funds may not be expended in aid of private ventures, even if the public indirectly benefits from the expenditure. Accordingly, the Attorney General argues that we should give article VI, section 29 an expansive reading so as to strike down the UTFC legislation in its entirety because its primary purpose is to benefit private enterprise. I think this contention should be firmly laid to rest because it is entirely without support in the Utah Constitution and in our case law.

In support of his claim for a broad construction of article VI, section 29, the Attorney General cites to the comments of several participants in the 1895 constitutional debates to the effect that article VI, section 29 was intended to prevent the expenditure of public funds in aid of private businesses under any circumstance, even if the public might ultimately benefit. That may have been the view of some of the delegates to the Utah constitutional convention; indeed, it might even have been the view of a majority. That fact is irrelevant, however, because no such ban was written into the constitution. Instead, as Justice Howe's opinion notes, the long-standing rule has been that the legislature is free to provide financial aid to private ventures in any way it chooses, so long as it finds that the public will ultimately benefit from the expenditure (a finding that this Court has traditionally been unwilling to examine closely), and so long as the means chosen to provide the financial assistance

does not run afoul of the two narrow, express prohibitions contained in article VI, section 29 against lending the State's credit and purchasing stock or bonds "in aid of" private ventures.[1]

Justice Howe's opinion demonstrates that this Court has never read article VI, section 29 as broadly as the Attorney General suggests, and the briefest reflection will demonstrate that the legislature has never thought itself precluded by this provision from expending public money for the benefit of private ventures. In the years since the constitution was adopted, the legislature has repeatedly benefitted private ventures through the expenditure of public funds. Perhaps the most obvious current examples are the many tax exemptions given private enterprise. A glance at our tax code reveals provisions creating exemptions for a number of specific businesses, exemptions that obviously cost the public money because everyone's taxes must be increased to cover the revenue losses resulting from these exemptions. *See, e.g.,* U.C.A., 1953, §§ 59-2-1(2) (property used for irrigation exempt from taxation); 59-2-7 (power plants, transmission lines, and property used for generating and delivering electrical power utilized in pumping irrigation water exempt from taxation); 59-2-32 (livestock exempt from taxation); 59-5-67(4) ($50,000 of gross value of minerals or oil and gas exempt from occupation tax annually); 59-13-4 (specified corporations exempt from franchise and privilege taxes) (Supp.1986).

In drafting the UTFC legislation, I presume that the legislature was aware of our long history of leniency toward measures that indirectly benefit the public by directly benefitting specific businesses. The majority's decision does not mark a retreat from that pattern of deferring to the legislature's judgments in this area. The legislature is still free under article VI, section 29 to use what it judges to be the most efficient and effective means for accomplishing legitimate legislative purposes, so long as it does not run directly afoul of one of the two archaic limitations on the powers of state and local government contained in that provision of our constitution. *Cf. Municipal Building Authority of Iron County v. Lowder,* 711 P.2d 273 (Utah 1985). Unfortunately, in the present case the legislature did authorize direct equity investment and, thus, ran afoul of one of these two specific prohibitions. Until the people choose to modify the constitution, we cannot ignore its plain language. Nothing we say today, however, should deter the legislature from devising other means to assist private enterprise when the legislature determines that such assistance is in the public interest.

DURHAM, J., concurs in the concurring opinion of ZIMMERMAN, J.

---

1. Implicit in the Attorney General's argument is the suggestion that the UTFC legislation is ill conceived. It may be that the legislation will primarily benefit a small group of promoters, underwriters, venture capitalists, and entrepreneurs who want to start or assist others in starting companies that are devoted to "high technology." It may also be that statistically, the chances that any one of these enterprises will succeed are slim. Moreover, the likelihood is speculative at best that any of the people of Utah, other than those directly involved in the specific venture, will ever realize any benefit. However, as the majority notes, under applicable legal principles, the wisdom or efficacy of the legislation is not for us to judge. *See Wilson v. Connecticut Product Development Corp.,* 167 Conn. 111, 355 A.2d 72 (1974).